**Robert J. RULE, Plaintiff–Appellant,**

v.

**BRINE, INC., also known as W.H. Brine Company, and William H. Brine, Jr., Defendants–Appellees.**

No. 1289, Docket 95–7986.

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1996.

Decided June 5, 1996.

Rodney A. Brown, New York City (Eileen Fox, Brown & Fox, New York City, on the brief), for Plaintiff–Appellant.

Andrew M. Calamari, New York City (Elyse D. Echtman, Donovan Leisure Newton & Irvine, New York City, on the brief), for Defendants–Appellees.

Before NEWMAN, Chief Judge, KEARSE, Circuit Judge, and WEXLER, District Judge.*

KEARSE, Circuit Judge.

Plaintiff Robert J. Rule appeals from a judgment of the United States District Court for the Eastern District of New York, Manuel L. Real, *Judge* **, dismissing his amended complaint seeking damages principally for breach of contract or unjust enrichment in connection with his designs of equipment for use in the sport of lacrosse. The district court granted summary judgment dismissing the amended complaint on the ground that Rule's claims depended on the existence of an agreement by defendant Brine, Inc. to pay Rule "reasonable royalties" and that Rule's testimony in deposition and at an evidentiary hearing was insufficient as a matter of law to support an inference that there was such an agreement. On appeal, Rule contends principally that summary judgment was inappropriate because there were genuine issues of material fact to be tried. For the reasons that follow, we vacate the judgment and remand for trial.

## I. BACKGROUND

Rule began playing lacrosse in high school in 1964, was an All–American in college, and was the starting goaltender on a team that represented the United States and won the

---

\* Honorable Leonard D. Wexler, of the United States District Court for the Eastern District of New York, sitting by designation.

\*\* Honorable Manuel L. Real, of the United States District Court for the Central District of California, sitting by designation.

world championship in 1974. Since 1973, he has been a high-school lacrosse coach. In the mid–1970s, based on his experiences as a goaltender and his knowledge of the rules applicable to the specifications for lacrosse sticks, Rule began developing a novel design for a goaltender stick.

At all pertinent times, Brine, Inc. or its predecessor W.H. Brine Company (collectively "Brine" or the "Company") was engaged in the manufacture and sale of sporting goods, including lacrosse-related products. Defendant William H. ("Bill") Brine, Jr., and his brother Peter Brine (collectively "the Brines") were officers of Brine and ran the Company. In 1976, the Brines got one of Rule's former teammates to introduce them to Rule.

Rule discussed with the Brines his design for the new goaltender stick, showed them a small clay model, and explained the reasoning behind the new design. William Brine opined that Rule's design was patentable. Rule and the Company entered into a relationship lasting more than a decade, during which Rule developed goaltender sticks and other lacrosse-related products on which Brine obtained seven patents naming Rule as the inventor. Pursuant to negotiations described in greater detail in Part I.B. below, Rule assigned his rights in these inventions to Brine, which manufactured and sold the products and paid Rule various sums, to wit, $200/month from 1975 to 1977, $400/month from 1977 to 1979, and $675/month from 1979 to 1990.

Toward the end of this period the relationship deteriorated, and in 1990 Brine stopped making payments to Rule. Brine continued, however, to manufacture and sell the patented products that had been developed by Rule. In 1991, Rule commenced the present action. As amended, the complaint alleged principally that Rule had assigned his rights in the inventions covered by the seven patents to Brine in exchange for Brine's agreement to pay him reasonable royalty fees and that Brine had breached the agreements, and been unjustly enriched, by failing to pay Rule

reasonable royalties. The amended complaint also alleged that defendants had committed patent fraud by obtaining a patent naming William Brine as the sole inventor of a product invented by Rule.

### A. The Proceedings Leading to the Summary Judgment Motion

After several years of discovery, the case was scheduled to be tried in June 1995. In April 1995, Brine sought the court's permission to move for summary judgment dismissing all of Rule's claims. Judge John Gleeson, to whom the case was then assigned, noted that he had asked the parties in January 1995 whether anything remained to be done before trial, and that although Brine had mentioned the possibility of a motion for partial summary judgment, it made no such motion. Judge Gleeson denied Brine permission to make a summary judgment motion in April because it had unduly delayed and the trial date was too near.

In May 1995, noting Rule's estimate that 30 days would be needed to try the entire case, Brine moved to bifurcate the trial, arguing that trying only liability issues first would serve the interests of judicial economy and would prevent potential prejudice to Brine. In an Order and Trial Notice dated June 21, 1995 ("June 21 Order"), Judge Friedman ***, to whom the case had been reassigned, granted the motion. He ordered that

[i]n the first phase of the trial, the jury will determine whether defendants "breached a contract with plaintiff to pay royalties for defendants' use of plaintiff's patented devices." . . . . If the jury decides this issue in plaintiff's favor, the same jury will determine in the second phase of the trial the amount of damages, if any, to which plaintiff is entitled.

June 21 Order at 1. No provision was made for the trial of any other issue or claim. Judge Friedman scheduled trial of the above contract liability issue to commence on or before August 7, 1995, before Judge Real. On

***Honorable Bernard A. Friedman, of the United States District Court for the Eastern District of    Michigan, sitting by designation.

**1006**

July 25, 1995, the parties were informed that the liability trial would commence on Thursday, August 3.

On August 3, the parties arrived in court ready to proceed with the limited trial but learned that two other cases were scheduled for trial before Judge Real that day. Judge Real stated that, instead of trying Rule's case, he would entertain a motion by defendants for summary judgment, returnable on Monday, August 7. Over Rule's objection to, *inter alia,* the lack of time to prepare to oppose such a motion, the court stated that, since Rule was ready for trial, the court would conduct an evidentiary hearing on the summary judgment motion, at which Rule could present live testimony. On Friday, Brine served on Rule extensive motion papers requesting summary judgment dismissing the amended complaint in its entirety.

B. *The Evidence Supporting Rule's Contract Claim*

The summary judgment hearing, which Brine's attorney described at the oral argument of this appeal as "in effect ... the trial of the contract claim in the case," began on August 7, with Rule as the principal witness. Rule described, *inter alia,* his lacrosse background and his meetings with the Brines. In the first meeting in 1976, after examining Rule's model for the new goaltender stick and stating that it was patentable and that Brine would like to market it, William Brine stated that

to pay you a royalty it's very hard to track the sticks on a month-to-month basis, very hard to do that, we'll pay a royalty for the month.

I [Rule] said, you are the businessman, you be fair with me.

He [William Brine] said, we'll pay you a *fair royalty, we'll keep track of it* and you'll get a *fair royalty* amount or *reasonable* or *equitable,* whatever word was used then to describe the royalty amount that I would receive.

(Summary Judgment Hearing Transcript ("Tr.") 15 (emphases added).)

In the fall of 1976, after Rule had devised lacrosse-oriented protective body pads, he again met with the Brines, who asked him to sign agreements assigning to Brine all his right, title, and interest in his inventions. Noting that those agreements provided that, in exchange, he was to be paid "One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged," Rule balked, saying,

it looks like I could sign this over for one dollar and you would make a lot of money, I would get nothing.

Bill Brine said, *we promised you a fair royalty, you will get a fair royalty* amount on this.

(Tr. 20 (emphasis added).) Rule testified, "I would not have signed the document unless I was absolutely sure that I was going to get a fair royalty amount." (*Id.*)

Rule also testified that the Brines assured him thereafter that the monthly sums Brine was sending him were the fair royalties he had been promised. For example, in connection with the $675/month paid from 1979 to 1990, he testified:

Since we agreed to reasonable and just royalty, I assumed that was the royalties that I was supposed to get for the stuff that I patented and assigned to the Brines to use.

. . . .

... I came back a year or two later, I said, how are sales on the items. And I believe Peter said the sales are okay, you are getting what you deserve, *you are getting what is fair.* I assumed he was talking about the fair and—royalties that we agreed upon.

(Tr. 48 (emphasis added).)

Brine's attorney pointed out to the court that defendants' summary judgment motion relied on Rule's testimony at his deposition. He argued that Rule's "deposition testimony clearly is to the effect there was no agreement other than the agreement to pay Mr. Rule[ ] specified fixed sums of money offered for 15 years," and that Rule's hearing testimony could not create a triable issue of fact merely by conflicting with his deposition testimony. (Tr. 70.) He cross-examined Rule, in part, as follows:

Q. In your words, [Brine said] we will pay you $200 a month as a fair royalty?

A. They would pay me a *fair royalty* amount and that would *start out* at $200 a month.

Q. And you said all right?

A. Yes.

Q. They never asked—offered you any sum of money, dollar amount beyond $200 a month at that initial meeting, is that correct?

A. *They said they would pay me a fair royalty.*

. . . .

Q. I would like to read from your deposition, if I may.

. . . .

"QUESTION: To the extent you can recall in paraphrasing the conversations what you said to them and what they said to you, I would appreciate that. To the extent you can recall the exact words I would also like . . . you to indicate that.

"ANSWER: . . . .

". . . . [William Brine said] it's very difficult to keep track of inventory and we'd like to pay you something instead of paying you a royalty of let's say something per stick, we'd rather pay you a royalty on a monthly basis. It's easier for us because it's very hard for us to keep track of the sticks. That's essentially, I'm paraphrasing the gist of the conversation.

"QUESTION: What did you say in response to what they said to you?

"ANSWER: As I recall, again I have to paraphrase, I said something to the effect like, you are the business people.

And I said something to the effect, I trust you to be fair with me, *equitable* with me, it's your business.

And they said, yes, we think it's *equitable*.

"QUESTION: To pay royalty per month?

"ANSWER: Instead of royalty per stick."

Q. Mr. Rule, it's correct they never used the words "*reasonable* royalties" with you, is this correct?

A. In sum *they used a word similar to that.* I'm not a tape recorder that I recall the exact words of a conversation that took place 16 years ago, but *I certainly remember there was a word "fair," there was a word "equitable," a word in there that indicated to me that I would get a fair royalty,* whatever that may be.

. . . .

Q. *Yes or no, they did not use the word "reasonable"?*

A. Sir, *they used a word similar to it.* Might be reasonable.

Q. I would like to read from your deposition transcript. . . .

. . . .

Q. "QUESTION: Since the beginning of the first complaint, have you ever had any doubts that they *used the words 'reasonable royalty'* when they had a discussion with you?

. . . .

"ANSWER: They used the word quote, 'royalties.' I wouldn't say 'reasonable.' "

. . . .

Q. Did they tell you they were giving you a percentage of sales?

A. No.

Q. You assumed that?

A. I assumed it from our agreement.

Q. They never agreed to give you a percentage of sales?

A. They agreed to give me a *reasonable* royalty.

(Tr. 73–75, 82 (emphases added).)

On redirect examination, Rule clarified that his understanding was that he was to receive fair royalties based not on Brine's total sales but on its sales of his products. (Tr. 115.) His attorney also introduced other parts of Rule's deposition:

"ANSWER: The contract was made on the first meeting that I met with the two Brine brothers in Needham, Massachusetts, in which *Bill Brine said to me* that because they could not keep track of the inventory exactly, *that they would pay me reasonable royalties for anything that I or that they produced.* The contract would

[*sic*] then reaffirmed. I believe it was November of 1976.

"QUESTION: Excuse me?

"ANSWER: I said it was reaffirmed on [*sic*] November 1976, it was in that time period, I can't speak of the exact time, but in that time frame where I was given two patent applications to fill out, and I believe it was for the goalie stick and the arm pads and two assignment documents to fill out. When I signed the documents, I was with Bill and Peter Brine and myself. I believe at that time it was the three of us.

"I then voiced concern about the one dollar that—it said good and valuable consideration. I believe that's the phrase there. And then I said something about a dollar and I was concerned—I believe it was *Bill Brine* that *said, no, we are going to give you what we said in the first meeting, which was reasonable royalties.*

"It was then confirmed then, the contract that—we had a meeting of minds, whatever, the conversation I had with Peter Brine, the conversation I had a year or two years ago. . . .

"I said, Peter, I said, we had an agreement you were going to pay me royalties.

"And he said, what did you think, you want me to pay you forever?

"I said, no, but as long as you produce items of mine, I expect something reasonable for it. *You said reasonable royalties. You were right there when your brother said it.*

"*He said, yes, but* we decided to pay, you know, more money. *We wanted a fresh start.*"

(Tr. 121–23 (emphases added).)

Rule was also questioned at some length by the court and testified as follows:

THE COURT: Mr. Rule, what express royalty did the defendants tell you that they would pay you? What express royalty?

THE WITNESS: They said that they would pay me a *fair royalty,* your Honor.

THE COURT: A fair royalty?

THE WITNESS: Yes, sir.

THE COURT: *And when you got the $200 a month, what did they say about the $200 a month?*

THE WITNESS: *That represented a royalty for the goalie stick, but it was partial compensation.*

THE COURT: They said it was partial compensation?

THE WITNESS: *They said that they would be able to figure out later on what a royalty would be for it, or words to that effect.*

THE COURT: Who said that to you and when?

THE WITNESS: I believe it was Bill Brine at the second meeting.

. . . .

THE COURT: Did any of the defendants ever tell you that they would pay you a royalty on each item that was sold?

THE WITNESS: Not each item but as part of the sales, I believe.

. . . .

THE COURT: . . . . What did they say to you about a percentage of the sales of the individual items?

THE WITNESS: *They said I would be paid a fair royalty.*

THE COURT: Did they say anything about a percentage of the sales of the items which you brought to them? Did any of the defendants ever say that to you, we'll give you a percentage—a fair percentage, a reasonable percentage, any percentage of the sale of the items that we sell?

THE WITNESS: Not in those exact words, your Honor.

. . . .

THE COURT: *The $200 figure, didn't they tell you that was a fair royalty?*

THE WITNESS: *Yes, at that time they did, yes.*

THE COURT: Where and when if they did, did any of the defendants tell you that they would set up a royalty account for you in addition to the payments of 200, 400 and 675?

THE WITNESS: They did not say that.

THE COURT: Or that they would keep a record of sales upon which to pay royalties?

THE WITNESS: They didn't say—

THE COURT: Did they say that to you?

THE WITNESS: The sales figures they would have, your Honor.

THE COURT: No, no. Did they ever say to you, in addition to the $200 per month, $400 per month, 675 [sic] per month, we'll keep a record of sales for the royalties in addition to that?

THE WITNESS: They did not say that to me, your Honor.

(Tr. 127–31 (emphases added).)

The evidence presented at the summary judgment hearing also included the testimony of Peter Brine, who stated that the Brines "did not agree to pay royalties" to Rule; that "[r]oyalties were never even discussed"; and that none of the payments made to Rule were considered by the Brines to be royalties. (Tr. 137.) He conceded, however, that Brine's corporate records described the payments to Rule for some 10 years as "royalty" payments. (Tr. 138.)

## C. The District Court's Decision

The summary judgment hearing, having begun on August 7, ended at 4:00 p.m. on August 8. At 1:00 p.m. on August 8, the court gave Rule's counsel a deadline of noon August 9 for the submission of a memorandum of law opposing summary judgment. At the conclusion of the hearing on August 8, the court stated that in its view there were no disputed material issues of fact to be tried.

On August 10, the district court ruled from the bench that summary judgment would be granted:

I believe that . . . either from the deposition of the plaintiff or the court testimony of the plaintiff, there are no disputed facts with reference to the formation of the contract and that *the contract was an oral contract to provide services for compensation,* whatever it might be called, *whether it be called wages or compensation or royalties, to provide the services which Mr.*

*Rule was to provide, including . . . the design of the lacrosse goalie stick and for those services he was to be paid two hundred dollars a month.* As time went on and his services and ideas increased, it was increased to four hundred dollars a month to be the total compensation that he was to receive and then to six hundred and seventy-five dollars a month, which was the compensation that he received.

. . . .

*Unfortunately, Mr. Rule[] had more thoughts about what he was doing than he was expressing, either to the Brines or Brine was expressing to him* and he got it all mixed up unfortunately. That was it and compensation, which was agreed upon on each occasion was something that he said he would be satisfied to take for the services that he was rendering and obviously he knew because he expressed that not only in deposition but in court *there was no promises [sic] of anything beyond compensation that had been discussed and accepted.*

(Tr. 204–06 (emphases added).) The court instructed Brine's attorney to prepare findings of fact as to which there was no controversy and submit a proposed order.

The order proposed by Brine and signed by the court ("August 28, 1995 Order") included the following findings of fact:

5. . . . . [Brine's] monthly payments covered all services plaintiff performed for the Company, including his lacrosse product ideas . . . .

6. . . . [T]he only "royalties" ever expressly discussed by the parties were the fixed monthly payments . . . .

7. . . . [T]he word "reasonable" was never used by the Brines, or anyone else on behalf of the Company, in any conversation about Rule's compensation. . . . [I]f [the words "fair and equitable royalty"] were used, they were used only to describe the fixed monthly payments. . . . [T]here is no evidence of any agreement to pay the plaintiff a "royalty" in addition to the fixed monthly compensation he received.

August 28, 1995 Order at 4–5. The court found that Rule's subjective understanding

that he would be paid "reasonable royalties" was an unexpressed, secret intention that, under New York law, did not become part of the parties' contract:

> The undisputed evidence of the parties' objective intent leaves no question that the parties' agreement was for fixed monthly compensation and nothing more.

*Id.* at 7.

On the premise that "all of the claims in the amended complaint depend on proof that an agreement for 'reasonable royalties' existed," *id.* at 1, the court dismissed the action. Judgment was entered accordingly, and this appeal followed.

## II. DISCUSSION

On appeal, Rule contends principally that summary judgment was inappropriate because there were genuine issues of fact to be tried. He also challenges, *inter alia*, the bifurcation order and the summary judgment procedures adopted by the district court. We find merit in part of Rule's challenge to the bifurcation order and we agree that summary judgment was inappropriate.

■ In light of our conclusion that the matter must be remanded for trial, we need not address all of Rule's challenges to the procedures followed in the district court. We are constrained to note, however, that Fed.R.Civ.P. 56(c) provides that a summary judgment motion "shall be served at least 10 days before the time fixed for the hearing," and that, while the district court may have discretion to shorten that period, it should not do so unless good cause is shown and the party opposing summary judgment will not thereby be unduly prejudiced. The record in the present case does not show good cause either for hearing defendants' summary judgment motion on two days' notice or for giving Rule less than 24 hours after the close of that expedited hearing in which to submit a memorandum of law and marshal the evidence adduced at the hearing.

### A. *Contract and Quantum Meruit Principles*

■ Several general principles of contract law provide the substantive framework for our discussion. Under New York law, which the parties do not dispute is controlling in this diversity case, the question of whether or not a binding contract exists "is not dependent on the subjective intent" of either party. *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 351, 361 N.E.2d 999 (1977). Instead, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984). The analysis must not put "disproportionate emphasis ... on any single act, phrase or other expression, but, instead, [should consider] the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d at 399–400, 393 N.Y.S.2d at 352, 361 N.E.2d 999.

■ In general, under New York law no enforceable contract comes into being when the parties leave a material term for future negotiations, creating "a mere agreement to agree." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981). However, an enforceable contract may be created if the parties agree that a contract term, such as price, is to be set by reference to prevailing industry standards. *See, e.g., Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989) (parties can agree that price will be set according to "commercial practice or trade usage"), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Further, in an appropriate case, a provision for the later fixing of a "reasonable" price may be sufficiently definite, in light of industry standards, to make the contract enforceable. *See, e.g., Catlin v. Manilow*, 170 A.D.2d 357, 357, 566 N.Y.S.2d 59, 59–60 (1st Dep't 1991); *cf. Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d at 111, 436 N.Y.S.2d at 250, 417 N.E.2d 541. In addition, even an agreement whose price term is to be set by reference to a valuation " '[to be] jointly agreed upon,' "

*Chase National Bank of the City of New York v. Manufacturers Trust Co.*, 265 A.D. 406, 407, 39 N.Y.S.2d 370, 372 (1st Dep't 1943) (quoting contract), which might otherwise be unenforceable, may become enforceable after a valuation has been stated, the contract has been partly performed in that respect, and there remains no uncertainty about what the parties meant, *see id.* at 410, 39 N.Y.S.2d at 374.

If the plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit "to assure a just and equitable result," *Bradkin v. Leverton*, 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643 (1970), where "the defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them," *id.* at 197, 309 N.Y.S.2d at 196, 257 N.E.2d 643. Such a recovery for unjust enrichment is permissible "when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another." *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916).

Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories. *See, e.g., Joseph Sternberg, Inc. v. Walber 36th Street Associates*, 187 A.D.2d 225, 228, 594 N.Y.S.2d 144, 146 (1st Dep't 1993).

### B. *Summary Judgment Principles*

The general principles governing consideration of a motion for summary judgment are well established. A party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In order to defeat a properly supported summary judgment motion, the opposing party must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed.R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact. Although a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony, *see, e.g., Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991), a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, *see, e.g., Villante v. Department of Corrections*, 786 F.2d 516, 522 (2d Cir.1986), especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation.

In ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995). The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Eastman Machine Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. *See, e.g., Fed R. Civ. P. 56(e) 1963 Advisory Committee Note; Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994); 6 *Moore's Federal Practice* ¶ 56.02[10], at 56–45 (2d ed.1986). Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment. *See, e.g., Frito–Lay, Inc. v. Morton Foods, Inc.*, 316 F.2d 298, 301 (10th Cir.1963).

### C. *The Record in the Present Case*

The record in the present case persuades us that summary judgment was inappropriate for two reasons. First, the record, taken in the light most favorable to Rule, would support a finding that Brine did in fact agree to pay Rule reasonable royalties. Second, if the jury is not persuaded that there was an enforceable contract for reasonable royalties, it may be persuaded that there also was no agreement limiting Rule's entitlement to the monthly amounts sent by Brine, that Brine paid Rule less than a fair amount, and that Brine therefore has been unjustly enriched.

#### 1. *The Evidence of a Contract for Reasonable Royalties*

■ Brine argues that summary judgment was appropriate because Rule's testimony showed that there was an agreement for Brine to pay Rule "only" the "fixed monthly" payments that Brine made over the years (Defendants' brief on appeal at 1), and that "the only evidence supporting plaintiff's claim for additional 'reasonable royalties' was his testimony that he subjectively understood the word 'royalty' to require the payment of something more than fixed monthly compensation—a subjective understanding which he admitted he never conveyed to the defendants" (*id.* at 2). These contentions, which were accepted by the district court (*see, e.g.,* Tr. 206 ("Unfortunately, Mr. Rule[ ] had more thoughts about what he was doing than he was expressing ... to the Brines or Brine was expressing to him ....")), simply do not take the record in the light most favorable to Rule, for Rule repeatedly testified, both in deposition and at the summary judgment hearing, that William Brine told him that Brine would pay him fair or equitable royalties.

For example, Rule testified at the summary judgment hearing that at his first meeting with the Brines, William Brine, when suggesting monthly payments,

> said, we'll pay you a *fair royalty, we'll keep track of it* and you'll get a *fair royalty* amount or *reasonable* or *equitable,* whatever word was used then to describe the royalty amount that I would receive.

(Tr. 15 (emphases added).) Describing that meeting in his deposition, Rule similarly had testified that

> "Bill Brine said to me that because they could not keep track of the inventory *exactly,* that they would pay me *reasonable* royalties for anything that I or that they produced."

(Tr. 121 (emphases added).)

At the hearing, Rule testified that in a subsequent meeting with the Brines, when he expressed concern over the patent-assignment agreements' provision that he was to be paid "a dollar plus good and valuable consideration,"

> Bill Brine said, *we promised you a fair royalty, you will get a fair royalty* amount on this.

(Tr. 20 (emphasis added).) This paralleled his deposition description of Brine's response to that concern:

> "Bill Brine ... said, ... *we are going to give you what we said in the first meeting, which was reasonable* royalties."

(Tr. 122 (emphasis added).)

When asked in his deposition whether the precise phrase "reasonable royalty" had been used, Rule responded that the word "royalties" had been used, but that he "wouldn't say 'reasonable.'" Defendants rely heavily on the nonuse of the exact word "reasonable" (*see, e.g.,* Tr. 74 ("Q. Mr. Rule, it's correct they never used the words 'reasonable royalties' with you, is this correct?"); Tr. 75 ("Q. Yes or no, they did not use the word 'reasonable'?")). However, Rule pointed out in his deposition that more than a decade had passed since the conversations at issue, that he could not remember the exact words spoken, and that he was paraphrasing. At the hearing, Rule testified that if William Brine did not use the precise word "reasonable," he used

> a *word similar to that.* I'm not a tape recorder that I recall the exact words of a conversation that took place 16 years ago, but I certainly remember there was a word "*fair,*" there was a word "*equitable,*" a word in there that indicated to me that I would get a *fair royalty,* whatever that may be.

(Tr. 74 (emphases added).) A rational jury could well infer that Brine had promised fair and equitable royalties and that this meant, and was reasonably understood by Rule to mean, reasonable royalties.

The district court's findings that "the only 'royalties' ever expressly discussed by the parties were the fixed monthly payments," and that "there [wa]s no evidence of any agreement to pay the plaintiff a 'royalty' in addition to the fixed monthly compensation he received," either overlooked or discredited Rule's testimony, *inter alia*, that William Brine said that Brine "would be able to figure out later on what a royalty would be," and "we'll pay you a fair royalty, we'll keep track of it and you'll get a fair royalty amount." A jury crediting that testimony could well find that William Brine's statement that Brine would "keep track of it" and pay Rule "a fair royalty amount" meant, and was reasonably understood by Rule to mean, that the uniform monthly sums would constitute an advance on royalties rather than his entire royalty entitlement. Though Rule also answered negatively the court's questions as to whether defendants told him that they would "set up a royalty account" for him or "keep a record of sales for the royalties," the jury could conclude that negative responses to those precisely focused questions are not irreconcilably inconsistent with Brine's having made a statement that it would "keep track" sufficiently to "figure out later" what would be a "fair royalty" and pay Rule accordingly.

Further, though the court inferred that the parties agreed that Rule would be entitled to receive only the fixed monthly sums that Brine actually sent him, a rational jury could infer that Brine's repeated assurances that the monthly sums it sent Rule were fair (*see, e.g.*, Tr. 130 ("THE COURT: The $200 figure, didn't they tell you that was a fair royalty? THE WITNESS: Yes, at that time they did, yes."); Tr. 48 (as to the $675 figure, "Peter said the sales are okay, you are getting what you deserve, you are getting what is fair")) constituted acknowledgement by Brine that, under the parties' agreement, the payment of fair royalties was required. The jury could also infer that Rule's innocent assumptions that Brine's representations were truthful did not constitute a modification of the contract.

Finally, we note that the district court also found that Brine owed Rule nothing for the period after 1990 because the agreement between Rule and Brine was terminable at will. We cannot uphold this ruling for two reasons. First, it assumes that there was an agreement other than the patent-assignment agreement, a proposition that the jury is free to reject. Second, it depends on the view that Rule's status was that of a Brine employee, for while an employment contract that lacks an express duration creates a relationship that is terminable at will, *see Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919 (1987), that principle is not generally applicable outside the realm of employment. In other contexts, "[i]n the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent," *Haines v. City of New York*, 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 157, 364 N.E.2d 820 (1977). In the patent context, for example, if a contract for royalties does not expressly define the period during which royalty payments are required, the implied period may last for the life of the patent. *See Sproull v. Pratt & Whitney Co.*, 108 F. 963, 964–65 (2d Cir.1901); *cf.* 6 Ernest B. Lipscomb III, Walker on Patents § 20:45 (3d ed. 1987) ("Apart from any express provision in the license agreement, if the licensee exercises the rights granted him under the license, he is liable during continuance of the license for the stipulated royalty."). The jury could easily infer that Rule was not Brine's employee, from, *inter alia*, the evidence (a) that he was a full-time employee of the New York schools at which he coached lacrosse; (b) that Brine never furnished Rule with Form W–2's, which the law requires an employer to give to its employees and which Brine did furnish to its employees; and (c) that Brine's records described its payments to Rule not as salary but as royalties. The jury could well infer that Rule, who had had no contact with Brine or the

Brines prior to his first invention, did not assign his patent rights to Brine with the understanding that Brine could stop paying him whenever it wished.

In sum, in light of the passages of Rule's testimony quoted above, the court's inference that the parties agreed that Rule would be entitled to receive only the fixed monthly payments that Brine made is hardly the only inference that is permissible. To be sure, there was also evidence—perhaps as much or more—to support that inference. But the decisions as to how to weigh the evidence, what testimony to believe, and which of competing inferences to draw are to be made by the jury after trial. The jury, of course, is free to view the evidence in the light least favorable to Rule. The court, on Brine's summary judgment motion, was not. Taking the evidence in the light most favorable to Rule, the jury could permissibly find that the parties agreed that, in exchange for Rule's assignments to Brine, Brine would pay Rule reasonable royalties and that there was no agreement that the monthly sums that Brine sent constituted the fair and equitable amounts that Brine had promised to pay.

## 2. *The Unjust Enrichment Claim*

Further, defendants' apparent view that, if there was no agreement that Brine would pay Rule reasonable royalties, the parties must have agreed that Brine would be obligated to make only the fixed monthly payments is specious. The jury would be free to infer that there simply was no meeting of the minds on either proposition. Just as Rule's belief that he would be paid "reasonable" royalties could not result in the contract he contends existed if that belief was an unexpressed secret intention, neither could an intention on the part of Brine to pay Rule no more than the monthly sums result in the contract that defendants contend existed if Brine's intention was not communicated to Rule.

■ In short, the evidence as to the statements Brine made to Rule and as to the parties' conduct over the years would permit the jury to reach any of at least three conclusions: (1) that the parties agreed that Brine would pay Rule reasonable royalties and that

the fixed monthly sums were advances, with reasonable totals to be calculated at some later time; or (2) that the parties agreed that Brine would pay Rule only the fixed sums per month actually paid; or (3) that there was no meeting of the parties' minds as to the meaning of "One dollar ($1.00) and other good and valuable consideration," with Rule believing that the fair-and-equitable-royalties interpretation of that term as expressed to him by Brine meant reasonable royalties on which he was to receive advance payments, and with Brine believing that that term meant only the fixed sums eventually paid.

If the jury reaches the third conclusion, it should then consider Rule's claim for recovery on a quantum meruit basis, and assess his contention that by manufacturing and selling products that use his inventions and refusing to pay him more than the monthly sums—or indeed to pay him any sums after 1990—Brine has been unjustly enriched. The district court's bifurcation order apparently ignored this possibility. That order required that Rule's contention that there was a contract for reasonable royalties be tried first and stated that, if the jury found in his favor on that issue, there would be a trial on damages. The order did not provide either for exploration of the quantum meruit claim at the first trial or for a later trial on that claim in the event that the jury found there was no contract. On remand, whether or not there is any other bifurcation, at least Rule's claims of breach of contract and unjust enrichment should be tried together.

## CONCLUSION

We have considered all of defendants' arguments in support of summary judgment and have found them to be without merit. The judgment is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

Costs to plaintiff.