**BOARD OF EDUCATION OF THE PLAINEDGE UNION FREE SCHOOL DISTRICT, Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY,**
Defendant.

**Connecticut General Life Insurance Company, Plaintiff,**

v.

**Gene Grasso, Defendant.**

**Gene Grasso, Plaintiff,**

v.

**Board of Education of The Plainedge Union Free School District,**
Defendant.

No. CV 01–2002(DRW)(WDW).

United States District Court,
E.D. New York.

March 22, 2004.

Ingerman Smith, L.L.P., Northport by Warren H Richmond, Esq., for Board of Education of the Plainedge Union Free School District.

L'Abbate, Balkan, Colavita & Contini, L.L.P., Garden City, By Claudia M. Kessler, Esq., Monte E. Sokol, Esq., for Connecticut General Life Insurance Company.

### *MEMORANDUM AND ORDER*

HURLEY, District J.

Plaintiff Board of Education of the Plainedge Union Free School District commenced this action seeking to void 31 insurance policy loan agreements on the theory that the loan agreements were signed by an individual who was not authorized to enter into that transaction. Defendant Connecticut General Life Insurance Company has since, with leave of the Court, impleaded a third-party defendant: the purportedly unauthorized individual. The Board of Education of the Plainedge Union Free School District and the Connecticut General Life Insurance Company have filed cross-motions for summary judgment. For the reasons discussed *infra*, the Court grants the Connecticut General Life Insurance Company's motion and denies the Board of Education of the Plainedge Union Free School District's motion.

### I. BACKGROUND

In evaluating a summary judgment motion, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). The Court has considered these requirements while evaluating the undisputed facts in the context of the each of the cross-motions for summary judgment. All of the facts set out below were derived from the exhibits identified in the parties' Local Civil Rule 56.1 statements of undisputed facts.

Between 1991 and 1993, pursuant to a retirement incentive plan, the Plainedge Union Free School District ("District") purchased 31 individual life insurance policies from Connecticut General Life Insurance Company ("Defendant"). These policies, known as either "Individual Flexible Premium Adjustable Life Insurance" policies or as "Universal Life Insurance" policies, insured the lives of "eligible school employees." By paying the premiums for these policies, the District hoped that certain teachers would be encouraged to retire early. The policies paid out a set amount of money to the retiring teachers and their beneficiaries. Any benefits that surpassed those set amounts would be paid to the District, thereby providing a collateral monetary benefit to the District.

The policies also have a "cash value" that is derived from the amount of premiums paid and the interest earned (less insurance charges and expenses). Due to this feature, the policy owner may take out a portion of the accumulated cash value in the form of a "policy loan." The interest on a policy loan may be paid annually or not at all. All unpaid interest is added to

the policy loan amount and likewise will accumulate interest. When the policy matures and must be paid out, either through death or some other operation, the outstanding policy loan and interest are deducted from the proceeds of that policy. According to the evidence, former Assistant Superintendent for Business Gene Grasso ("Grasso") negotiated the set up of this incentive.[1] On April 18, 1991, the District approved the Grasso-negotiated retirement incentive plan by issuing a resolution. The memorandum of agreement that was accepted by the resolution expressly states that "the District shall own the policy, including any accumulated cash value." Plaintiff's Ex. A2 at 2.

In June 1991 agents of Defendant—including Frank Capodacqua ("Capodacqua")—went to visit each of the twenty-four retiring teachers that were availing themselves of these policies. After interviewing those teachers and after preparing the appropriate forms, Capodacqua sought to complete the application process for these individual teachers. This required a signature from the District. When Capodacqua sought out a District representative, he was told by District employees that Grasso would sign the forms. When Grasso signed those twenty-four individual forms, he also provided Capodacqua with checks that were intended to make advance payment on any premiums owed on temporary life insurance agreements. When the policies issued for those retiring teachers, Capodacqua met again with Grasso. At that time, Grasso provided Capodacqua with checks covering the balance of the premiums owed for that year: $163,200.00. Grasso provided Capodacqua with policy receipts, which were signed by Grasso, indicating that the District had received the policies.

In 1992 Capodacqua again met with Grasso to discuss the policies. At that time, Grasso informed Capodacqua that five teachers were retiring that year and would need these policies. Capodacqua met with each of the retiring teachers and helped them to complete their applications. Once the applications were completed he would meet with Grasso. Grasso would sign the applications on the District's behalf, pay the $34,000.00 in premiums for that year and sign the policy receipts after receipt of the actual policies. These same procedures were followed in 1993 and 1994.

During this period, Capodacqua dealt almost exclusively with Grasso. The only other contact that Capodacqua had with the District was through Ida Brtalik ("Brtalik"), who was the District treasurer. Brtalik's duties include management of the District's accounting and assisting Grasso.

In March 1995 Grasso contacted Capodacqua, Defendant's agent. In response to a request by Grasso, Capodacqua prepared a list explaining the cash value on all of the policies. See discussion supra. Capodacqua further advised Grasso that the District could obtain policy loans totaling $321,007 against the 31 then-existing policies. Grasso told Capodacqua that the District desired to take out policy loans for this full amount. Capodacqua did not inquire as to whether further approval was necessary. After approval of the policy loans by Defendant, the loan checks were sent directly to the District.

It is undisputed that Grasso personally believed that he had authority to consummate these policy loans on behalf of the District. See Defendant's Ex. G at 78, 153. Specifically, Grasso considered the cash value of the policies to be the liquid assets

---

1. The District stresses that Grasso had no actual authority to contract in these discus- sions.

of the District. As such, when he consummated these policy loans, Grasso believed that he was merely "transferring [the assets] ... from one account to another account." *Id.* at 145. Grasso further believed that the decision on how to free up these assets for immediate use by the District was made by him without any input from the District, *see id.* at 111–112, which he felt was appropriate because of his position as Assistant Superintendent for Business and because the handling of the insurance policies "came under [his] jurisdiction," *see id.* at 49.

At the time, Brtalik was informed that Grasso had signed for these policy loans. As treasurer of the District, she noted the receipt of the resultant checks and deposited those checks in the District's general fund account. These funds were recorded in the District's "cash book." These funds were also reflected in the April 1995 Treasurer's Report. On this Report, the funds were listed as "insurance recoveries." The term "insurance recoveries" would also embrace surplus funds collected from a policy that was paid due to death or some other triggering event. *See* Defendant's Ex. 6 at 2. However, in the entire eleven years that Brtalik served as District Treasurer, the funds listed as "insurance recoveries" in the monthly Treasurer's Report had never exceeded $300. Brtalik Dep. at 52. In April 1995 the amount of "insurance recoveries" funds listed in the Treasurer's Report exceeded $320,000. The District approved this April 1995 Treasurer's Report by resolution. However, Brtalik had never been questioned by District with regard to the amounts contained in previous Treasurer's Reports. Nor had Brtalik ever been denied approval for any previous Treasurer's Report.

In May 1995, after Grasso signed the policy loan applications and those policy loans were approved by Defendant, Defendant sent 31 letters to the District—one for each individual policy loan—indicating that interest was due on each of the policy loans. Each May from 1995 until 2001, these letters were received in the District offices. Similarly, in June 1995, and annually thereafter, 31 individual letters were sent to the District offices indicating that the interest had been added to the policy loan amount. In addition, annual statements were issued for each of the individual policies. These statements listed the date and amount of the policy loans, as well as the amount of interest charged.

In December 1997, Richard Jacullo, one of the relevant policy holders, died. On January 6, 1998, Defendant provided the District with a document titled "Reconciliation of Policy Proceeds." That document listed the amount of the proceeds that would be paid to the District. That document further showed how the amount of the proceeds were reduced by the policy loan amount. When the proceeds were sent to the District, they were reduced by the policy loan amount.

Also in 1997, outside consultants called the Educators Financial Resource prepared and submitted an "Appraisal Report for Life Insurance on Retired Teachers" ("Appraisal Report") for the District. *See* Defendant's Ex. I, tab A. The Appraisal Report was submitted to and read by the District. The Appraisal Report reviewed the effectiveness of the life insurance plan in encouraging retirement and reducing the overall burden upon the budget caused by teacher salaries. *See id.* at 7. As part of this review, the Report noted that policy loans had been taken out and summarized the financial effect of these loans. *See id.* at 15. In March 1999, the same consultants, the Educators Finance Resource, prepared an "Asset Management Plan for the Plainedge Central School District 1999" ("Asset Management Plan"). *See* Defendant's Ex. I, tab A. This Asset Man-

agement Plan also noted the existence of the policy loans. *See id.* at 3. The District paid the Educators Finance Resource to prepare both the Appraisal Report and the Asset Management Plan.

On February 6, 2001, the District initiated this action by filing a complaint in New York State Supreme Court. In the complaint the District requested, inter alia, that the Court declare the policy loans to be null and void. On March 30, 2001, prior to answering the complaint, Defendant removed the action to this Court. Defendant filed a motion to dismiss the case on August 1, 2001. After a hearing on the motion, the Court, ruling from the bench, denied Defendant's motion. Pursuant to a stipulation and order, signed by the parties and the Court, Defendant did not file an answer until November 8, 2001. In accordance with the Court's individual practice rules, on January 25, 2002, Defendant requested a pre-motion conference regarding a possible motion to implead Grasso. The motion for leave to implead was subsequently briefed by the parties. On November 6, 2002, the Court granted the motion to implead. The instant cross-motions for summary judgment were fully briefed and submitted to the Court on December 17, 2003.

## II. DISCUSSION

### A. Summary Judgment Standard.

The parties have submitted the instant cross-motions under Federal Rule of Civil Procedure 56. The legal principles employed by the Court when ruling upon a motion for summary judgment are well-established. It is axiomatic that summary judgment may be granted only when it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Dona-*

*hue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). To meet this standard, the moving party bears the initial burden. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The moving party meets this initial burden by proffering evidence "showing the absence of a genuine issue as to any material fact." *Id.* Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, the non-moving party "must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed.R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule,* 85 F.3d at 1011. In reviewing these materials, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Id.*

### B. Apparent Authority.

█ As mentioned *supra,* the District initiated this action to declare the relevant policy loans void and unenforceable. In other words, the District seeks to void the policy loans, and the concomitant obligation to repay, while not repaying any of the funds that they have already received and spent. It appears likely that, at a minimum, such a situation would give rise to an equitable remedy. However, because the Court concludes that apparent authority binds the District to the contract made by Grasso on their behalf, the Court need not reach those equitable arguments.

"Apparent authority arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on [its] behalf by the person

purporting to act for him.'" *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir.2003) (quoting *Minskoff v. American Exp. Travel Related Services Co., Inc.*, 98 F.3d 703, 708 (2d Cir.1996)(internal quotation omitted)); *see also* Restatement (Second) of Agency § 27. Defendant maintains that the conduct of the District, evaluated as a whole, was sufficient to allow a reasonable person to conclude that Grasso had authority to take out these policy loans on the District's behalf. The District predictably disagrees. The Court will address the District's arguments in the order that they were presented.

First, the District contends that no apparent authority can attach to municipal corporations. *See* District's Mem. at 6–7. In support of this proposition, the District relies upon *Genesco Entertainment, a Div. of Lymutt Industries, Inc. v. Koch*, 593 F.Supp. 743, 748 (S.D.N.Y.1984). That case stated the following:

> When acting in its corporate capacity, a municipality is held as accountable for its obligations as are individuals and corporations in the conduct of business. Unlike individuals and private corporations, however, a municipality's power to contract is statutorily restricted for the benefit of the public. Statutory restrictions on a municipal corporation's power to contract protect the public from the corrupt or ill-considered actions of municipal officials. To allow recovery under a contract which contravenes such restrictions gives vitality to an illegal act and grants the municipality power which it does not possess to waive or disregard requirements which have been properly determined to be in the interest of the whole. Hence, while a municipal corporation must honor its authorized commitments, it is not bound to contracts entered into by employees outside their authority. It is established law in New York that where there is a lack of authority on the part of agents of a munici-

pal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed.

*Id.* at 747–748 (internal quotation and footnotes omitted).

The Court has read this case thoroughly. After careful consideration, the Court concludes that the holding of this case—that apparent authority cannot bind a municipality—is limited to those circumstances where a municipal employee's authority is limited by statutes or regulations. This interpretation is supported by reference to the New York cases relied upon in *Genesco*. *See Scarborough Properties Corporation v. Village of Briarcliff Manor*, 278 N.Y. 370, 376, 16 N.E.2d 369 (1938) ("The defendant village has only those powers which the Legislature has conferred upon villages of the third class, and the powers so conferred upon the village may be exercised only in the manner provided by the Village Law, and through the officers authorized by the statute to act for the village."); *Lutzken v. City of Rochester*, 7 A.D.2d 498, 184 N.Y.S.2d 483, 486 (4th Dep't 1959) (quantum meruit could not be applied where the city charter prohibited authority); *Evans v. City of Johnstown*, 96 Misc.2d 755, 410 N.Y.S.2d 199, 205 (N.Y.Sup.1978) (rule against apparent authority is "not inviolate" and has an exception where neither public policy nor a statutory restriction are implicated). The Court's interpretation is further supported by New York case law interpreting this restriction on apparent authority in the same manner. *See, e.g., Cassella v. City of Schenectady*, 281 A.D. 428, 120 N.Y.S.2d 436, 440–41 (3d Dep't 1953).

In the instant case, no statute or regulation has been presented to the Court that would limit or curtail Grasso's authority.

Nor has the District proffered any District bylaw or rule. Therefore, unlike the purported agent in *Genesco*, Grasso was not acting beyond his statutorily limited authority. In such situations, the Court concludes that the municipality is acting "in its proprietary capacity ... [and will be] subject to the same standards and restraints as are applicable to a private individual or a corporation in the conduct of similar business." *Van Curler Devlop. Corp. v. City of Schenectady*, 59 Misc.2d 621, 300 N.Y.S.2d 765, 773 (1969). For this reason, in the instant circumstances, apparent authority may still bind the District. *See also* November 6, 2002, Order at 6. The Court therefore turns to the question of whether the undisputed facts establish, for the purposes of summary judgment, apparent authority.

■ The Court first notes Grasso's position. Grasso was the Assistant Superintendent for Business. The District stresses the "assistant" aspect of this title. However, the undisputed facts indicate that, although Grasso was an assistant to the District Superintendent, he held the highest position with regard to the District's financial affairs. This title, and the related position, indicate to a reasonable observer that the District entrusted Grasso with the District's financial affairs. The District stresses that this position conferred no actual authority to take out the policy loans. However, no aspect of the title itself communicated any limitations. Thus, the title indicates that Defendant could reasonably believe that Grasso possessed authority to take out the relevant policy loans.

The Court next considers Grasso's course of conduct with Defendant and Defendant's agents. It is undisputed that Grasso conducted the negotiations with Defendant regarding the underlying retirement life policies. There is no indication that Defendant was ever told that District approval was needed for these underlying policies. To the contrary, the evidence indicates that Grasso negotiated the terms of the policies, coordinated all collateral interactions with the Defendant, signed all of the policies on behalf of the District, and handled the disbursement of all premium payments. The District's role was merely to approve the original deal that Grasso set up. *See* District's Ex. E. at 32–33. Nonetheless, the Court notes that there is no indication within the evidentiary record that this approval role was communicated to Defendant. Moreover, the Court notes that the District's role with regard to these policies ceased after approval of the overall plan. As discussed *supra*, each individual policy required a separate application form and a separate approval by a District representative. These applications, which were solely signed by Grasso, would bind the District to pay premiums on behalf of the retiring teachers.[2] The validity of these individual policies, and of Grasso's signatures on District's behalf, are not contested in this or any action. All of these facts indicate that the District vested a great deal of responsibility in Grasso for the administration of the relevant policies. This responsibility included the signing of substantive contracts on the District's behalf and therefore could reasonably be viewed as more than merely ministerial.

2. There is some indication that these applications were sent to the District for approval at some later point. *See* District Ex. E at 75. However the record is inconsistent on whether such approval was actually ever sought. *See id.* at 76 (indicating that the signed applications were never sent to the District for approval). Moreover, there is no indication anywhere in the evidence that this approval process, if it existed, was communicated to Defendant.

The Court next considers Grasso's own beliefs. The proffered evidence unequivocally establishes that Grasso believed that he had authority to execute the relevant policy loans. Grasso stated that this belief was based, in part, upon the broad authority that the District had given him to plan and administrate the retirement insurance plan. Grasso's subjective belief does not constitute an act by the District. *See Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir.1989). This belief does, however, reflect the scope of the authority and responsibilities granted by the District to Grasso. In part, Grasso's beliefs flowed from the collateral discretion that the District granted him with regard to the policies. For that reason, Grasso's belief warrants mention.

Finally, the Court considers the salient features of the policy loan transactions themselves. The District claims that the nature of these policy loans render any reliance upon the apparent authority of Grasso patently unreasonable. The District further argues that Defendant's failure to make any inquiry into Grasso's actual authority negates any apparent authority. *See* District Mem. at 16–18. According to the District, Defendant had a duty to inquire because of the unique nature of the policy loan transaction and his own inexperience in dealing with public entities. *Id.* at 17. This argument fails to persuade the Court.

The undisputed facts indicate that the District had never before taken out a policy loan. However, the undisputed facts also demonstrate that this type of transaction was neither novel or unique. On April 18, 1991, the District approved the retirement insurance incentive plan by resolution. This plan and the related insurance policies were, in the District's words, "discussed ... at length with insurance brokers, legal counsel and unions representing the three affected collective bargaining groups." Plaintiff's Mem. at 2. All of the policies that flowed from this plan were adopted by the District after Grasso signed them on the District's behalf. The validity of these individual policies are not questioned. All of these valid policies enunciated the mechanism for performing the policy loans. This mechanism reflected the cash value of the policies themselves, a prominent and attractive feature of the plan that was presented to the District for approval in 1991. *See* District's Ex. A2 at 2 ("the District shall own the policy, including any accumulated cash value"). Thus, the terms and the processes for taking out these loans were not negotiated anew by Grasso. Instead, Defendant—through its agent Capodacqua—merely applied the formulae and processes that had been reviewed and approved by the District. Accordingly, rather than representing an entirely new transaction, with novel processes, these policy loans were aspects of earlier transactions that were approved by the District. Given that the District had, through its actions and inactions, ceded all responsibility for managing that insurance plan to Grasso, the inclusion of the policy loans within that approved plan is notable.

Also, the District commissioned two financial reports from independent consultants that discussed these policy loans: the Appraisal Report and the Asset Management Plan. Although the reports discussed the amount and financial consequences of the outstanding policy loans, they did not regard these policy loans as an unusual or extraordinary feature in the District's asset portfolio. If these policy loans were truly unique, these reports would likely have reflected that unique character in their analysis of the liabilities and responsibilities flowing from those policy loans. These reports also lead the Court to the next set of facts that weigh against regarding these policy loans as novel and unique.

Through the Appraisal Report and the Asset Management Plan as well as the April 1995 Treasurer's Report, the District was fully advised of the amount of these policy loans as well as their source[3]. In the relevant Treasurer's Report, the District was presented with an amount of recovery that was one thousand times greater than usual. *Compare* Defendant's Ex. 6 at 2; Brtalik Dep. at 52. Nonetheless, the District never considered these policy loans significant or extraordinary enough to intervene or even comment.

The District also argues that the monetary amount of these policy loans are so large that the transaction was automatically unique and, therefore, Defendant had an affirmative duty to inquire as to Grasso's authority. The Court does not agree. The amount of money involved, more than $320,000, would undoubtedly be considered significant in the lives of most private individuals. *See* Fichter Aff. ¶ 6. However, these policy loans were not executed on behalf of a private individual. Instead, they were executed on behalf of a large municipal entity. This is an entity that, during the single month reflected by the April 1995 Treasurer's Report, received fifteen individual types of incoming revenue totaling nearly four million dollars. *See* Defendant's Ex. 6 at 2. Moreover, compared with the total financial responsibilities incurred under the retirement insurance plan, the amount of the policy loans also pales in comparison. In a similar vein, the Court notes that, in 1995 alone, it is undisputed that the District voluntarily paid $163,200.00 in premiums on policies for which Grasso signed the application forms. Against that backdrop, the total monetary amount of the loans does not loom so large that it would alter a reasonable person's duty to inquire.

The District next argues that, because Capodacqua did not have experience in these types of transactions, the District had a higher duty to inquire as to Grasso's authority. The relative experience of Capodacqua may provide an explanation as to why he failed to inquire. However, given the overall context of these transactions and the continuing dealings with Grasso, the Court cannot conclude that Capodacqua's duty was different from a hypothetical reasonable individual. Simply put, the District performed several affirmative acts that would lead a reasonable person in Capodacqua's position, regardless of the relative experience, to believe that Grasso was vested with the appropriate level of authority.

In the instant case, the District repeatedly expressed, through both affirmative actions and conspicuous inaction, their reliance upon Grasso in financial matters. This reliance was affirmatively expressed via appointment of Grasso to a position where he coordinated the District's finances. The District further evinced this reliance by permitting Grasso to conduct all negotiations with Defendant for the relevant retirement insurance plan. After approval of the Grasso plan, the District further demonstrated its reliance upon its Assistant Superintendent for Business by permitting him to handle the administration of this plan. The administration of this plan involved more than merely ministerial acts. For example, the District permitted Grasso to determine those employees that were eligible for insurance and signing their application forms on the District's behalf—thereby expanding the scope of the District's financial obligations under the retirement insurance plan. (Each new application for insurance bene-

---

**3.** The Court notes that, while the relevant Treasurer's Report indicated that the monies came from "insurance recoveries," it did not specifically state that these funds flowed from policy loans. *See* Defendant's Ex. 6 at 2.

fits, when approved by Defendant, increased the District's financial obligation to make premium payments.) Finally, the District indicated their reliance upon Grasso by not auditing or reacting to the various notices that indicated the existence of the policy loans.

In sum, the undisputed evidence indicates that the conduct of the principal, the District, was reasonably interpreted by Defendant. The Court concludes that this conduct would reasonably causes a third person to believe that the principal consented to enter into the relevant policy loans acting through its apparent agent Grasso. Due to these reasonable outward expressions of consent and authority, the District is bound to the terms of the policy loans through the doctrine of apparent authority. *See Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir.2003)

### III. CONCLUSIONS

In light of the foregoing, the Court GRANTS Defendant's motion for summary judgment. For substantially the same reasons, the Court DENIES the District's motion for summary judgment. The Court notes that, as reflected by the caption on this order, there is now a third-party complaint. The Court, in the context of the instant order, does not render any decision with regard to the third-party complaint.

**SO ORDERED.**