**Rebecca LAMAY, Lauriston LaMay, Plaintiffs,**

v.

**TOWN OF BLOOMFIELD, Anthony Magno, Richard Mulhall, Daniel Rosenthal, and Connecticut Light and Power, Defendants.**

**Nos. 3:97CV1454(WWE), 3:97CV1455(WWE).**

United States District Court, D. Connecticut.

July 21, 1999.

John A. Blazi, Waterbury, CT, for Rebecca LaMay and Lauriston LaMay.

Scott M. Karsten, Christopher Arciero, Sack, Spector & Barrett, West Hartford, CT, for Town of Bloomfield, Daniel Rosenthal, Anthony Magna and Richard Mulhall.

Maureen Danehy Cox, Richard L. Street, Carmody & Torrance, Waterbury, CT, for Connecticut Light & Power Co.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

Plaintiffs, Rebecca and Lauriston LaMay who are husband and wife, have filed

a multi-count complaint against the Town of Bloomfield ("Town"), former Chief of Police Anthony Magno, Captain Richard Mulhall, and Sergeant Daniel Rosenthal (collectively "the individual police defendants"), and Connecticut Light and Power ("CL & P"). The complaint makes claims of common law tort, state statutory violations, and federal constitutional deprivations.

Specifically, counts one through fourteen against the individual police defendants and the Town allege liability for negligent nuisance and violation of state statutory law. Counts fifteen through twenty against the individual police defendants and count twenty-one against the Town seek damages pursuant to 42 U.S.C. § 1983.

The individual police defendants and the Town move for summary judgment on counts one through twenty-one. Plaintiffs oppose both motions for summary judgment.

### BACKGROUND

The following facts have been taken from the Local Rule 9(c) statements and affidavits submitted by the parties. At 4:30 p.m. on July 9, 1994, a young Hispanic girl was reported missing in the Farmington River in an area known as the Tariffville Gorge. The gorge lies below Route 189 down a steep, heavily forested incline. The river is accessible by a footpath from a dirt turnaround off of Route 189.

The search for the drowning victim took place from July 9 to July 11, 1994, when the victim's body was recovered. State and local police, firemen, volunteers, and family members of the drowning victim participated in the three day search efforts. At various times throughout this period, people interested in the search for the girl and members of the media assembled at the gorge area, along the river banks, and at the Route 189 turnaround.

Police Chief Magno was on vacation on on the dates between the July 9th drowning and the July 11th recovery of the victim. In the absence of Chief Magno, Captain Mulhall was placed in charge, and he kept Chief Magno informed of the situation. Captain Mulhall also assessed the needs of the search efforts with Sergeant Rosenthal. At various times throughout the three day period, Captain Mulhull and Sergeant Rosenthal met with family and friends of the victim, providing them with updates on the search efforts.

On July 9, at approximately 4:30 p.m., Officer Mathena and Sergeant Rosenthal responded to the report of the drowning at the gorge. When the officers arrived at the scene of the drowning, they observed several people in the water and on the river banks searching for the victim. Officers from the Simsbury Police Department and members of volunteer fire departments of Bloomfield, East Granby, and Simsbury were also present.

After learning that the Bloomfield Fire Department dive team was no longer active, the Bloomfield officers contacted the state police dive team at 5:30 p.m.

People assembled at the gorge became upset due to the delay in obtaining a team of divers and the lack of organized rescue efforts. Some people uttered obscenities, criticized the Bloomfield police for not going into the water, or expressed belief that more would have been done had the drowning victim been white. All on-duty Bloomfield police officers were sent to the scene.

The members of the state police dive team arrived between 6:40 p.m. and 7:20 p.m. By this time, the people at the gorge were hostile. Some people, incited by a woman known as Cassandra Williams, screamed at the dive team, "Get the fuck in the water!" The police officers cleared people out of the way as the team members proceeded towards the river.

The dive team searched the area until 9:13 p.m., during which time people yelled obscenities, threw objects, and made threatening statements directed at the

**586**

dive team members. Officers observed some street gang members present in the crowd [1].

Although angered that search efforts had to be suspended due to insufficient light, people responded to the officers' orders to disperse from the area. The police cleared individuals who were unrelated to the victim from the area before the dive team got out of the water.

On July 10, the Bloomfield police escorted the state police dive team to the East Granby side of the river. Ten to thirty-five people congregated at the section of the river where the recovery efforts took place. Again, individuals exhibited highly charged emotions, frustration, and anger due to the dive team's inability to find the drowned girl.

After the divers stopped searching at 1:45 p.m., some members of the crowd reiterated that more could have been done and would have been done had the victim been white. Some individuals followed the divers up to Route 189.

At approximately 3:30 p.m., Officer Mathena met with Cassandra Williams at the gorge. At that time, he did not issue orders for the crowd to disperse. He did not monitor or remain at the scene after his meeting with Williams.

At 5:30 p.m., approximately thirty-five people blocked motorists from passing on Route 189. The crowd threatened a motorist and banged on his car. The motorist was unable to proceed through the crowd and turned around. He later called 911 to report that the crowd was blocking traffic on Route 189. The Bloomfield police recorded the call as a breach of the peace and dispatched all available cars.

At that time, Sergeant Kitchens, who was the shift commander, had received no information concerning the crowd's conduct on July 9th. However, he was aware that the circumstances surrounding the activities at the gorge related to the drowning of the girl.

He met with the angry crowd and, in light of the surrounding circumstances, decided to let the people vent rather than make arrests. Therefore, the police turned cars away from the area advising motorists of alternate routes. The crowd dispersed at approximately 7:00 p.m., and no reports concerning criminal conduct, assault or property damage were made.

State police divers renewed the search at 9:00 a.m. on July 11th [2]. Throughout the divers' search, a Bloomfield police officer remained on each side of the river. Approximately thirty-five individuals on the bank of the river observed the search. Individuals shouted obscenities and threats indicating that the divers would be shot if the body was not found [3].

After the dive team's search ended at 2:15 p.m., most of the people cleared out of the area. By the time the divers reached their vehicles at Route 189, only three to four individuals remained. The state dive team and Bloomfield police then left the area.

At 4:35 p.m., plaintiff Rebecca LaMay drove home via Route 189 and observed only one car in the turnaround.

However, by 5:30 p.m., a group of people had reassembled at the gorge to search for the drowning victim's body. Reporters from Channel 30 News, who were in the area, called Bloomfield police to report that their truck had been vandalized by a "rowdy crowd."

1. Officer Mathena, who had contact with certain of the street gang members, stated that they conducted themselves as "fairly reasonable people" during the search efforts.

2. Captain Mulhall, who was notified of the July 10th traffic blocking incident on the morning of July 11th, issued no crowd control instructions to officers responsible for the gorge area that day.

3. Neither Captain Mulhall nor Sergeant Rosenthal were made aware that the state police divers had been verbally threatened by any person at the site of the search and recovery effort.

One Bloomfield officer was dispatched to the area. Sergeant Rosenthal also responded because of the potential for a problem. A third officer arrived at the scene because he was curious about the situation. None of the officers knew that the crowd had been reported as "rowdy."

The police discovered that a media cable from the Channel 30 news truck had been pulled but could not determine whether an intentional or accidental act had occurred. The officers observed that people were still upset and emotional about the drowning but were cooperative in response to the inquiry into the alleged vandalism of the news truck. The officers left after the news vehicle departed from the scene.

At approximately 6:45 p.m., the individuals at the gorge recovered the body, which was reported to the Bloomfield police at 6:49 p.m.

Shortly thereafter, a motorist on Route 189 observed two men on the side of the road near the turnaround area summoning him for assistance. After the two men asked him if they could use his cell phone to call an ambulance, the motorist observed a group of people come up from the river carrying the body of the girl. He responded that he had no cell phone but would call from his home. He then proceeded along Route 189 without incident.

Plaintiffs Rebecca and Lauriston La-May, who were also traveling southbound on Route 189 on a motorcycle at approximately this time, observed a group of people in the northbound lane moving into the southbound lane. Two vehicles were stopped because of the people in the road. The LaMays then sped down the right shoulder or breakdown lane of the roadway in an attempt to drive through the group of people. As the LaMays approached, individuals on the road became agitated and moved toward them. The individuals then pushed the LaMay's motorcycle against the guard rail. Mrs. La-May fell off the motorcycle due either to people pushing her or to the impact of the falling motorcycle. Mr. LaMay, who re-mained on the motorcycle tipped against the guardrail, was hit by members of crowd. Mr. LaMay recalls that the attack was over in a "matter of seconds."

After the people moved away from his motorcycle, Mr. LaMay righted the motorcycle without assistance. After Mrs. La-May mounted the motorcycle, Mr. LaMay drove away. As they proceeded in the southbound direction, they observed Bloomfield police officers arriving at the scene in cruisers with lights and sirens activated.

The Bloomfield police, who arrived at the scene, took a "damage control" approach and no orders were issued for the officers to make arrests or to clear the roadway.

## DISCUSSION

### A. Standard of Review

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of

proof, then summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

B. *Section 1983 Claims Against the Individual Police Defendants*

Defendants argue that summary judgment against the plaintiffs is appropriate because the plaintiffs have failed to demonstrate a constitutional deprivation. Plaintiffs allege that the defendants violated their fourteenth amendment rights by failing to fulfill their affirmative duty to preserve law and order when confronted with a dangerous and hostile crowd.

■ In order to state a claim pursuant to Section 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

■ State officials do not have a general constitutional responsibility to safeguard members of the general public against private violence. *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 197–201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). However, in *DeShaney,* the Supreme Court distinguished this rule from instances where the state creates a risk faced by a plaintiff.

■ Interpreting *DeShaney,* the Second Circuit established that a constitutional violation occurs where the state has created or assisted in increasing the danger to the victim. *Dwares,* 985 F.2d at 99. Courts

have recognized Section 1983 liability pursuant to such state-created danger where state actors commit affirmative acts using their authority to create an opportunity for harm to the plaintiff that would not otherwise have existed. *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3rd Cir.1996) (but for the intervention of the police, harm to an intoxicated woman would not have occurred).

■ In contrast, nonfeasance does not give rise to a constitutional violation on which to predicate Section 1983 liability under the state-created danger theory. *Dwares,* 985 F.2d at 99 (allegations that police officer failed to act on reports of past violence do not implicate a constitutional violation). In *Dwares* the complaint went well beyond allegations that the defendant officers merely stood by and did nothing. It alleged that the officers had conspired with "skinheads" to permit the beating of flag burners.

One circuit has even held that police officers have no affirmative obligation to protect citizens from an illegal activity such as drunk driving and therefore could watch drunk drivers stumble to their cars, drive off, and weave across the road without incurring Section 1983 liability. *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir. 1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).

The Court is not persuaded that the instant facts, even when construed in the light most favorable to the plaintiffs, give rise to Section 1983 liability. Even if the Court assumes that defendants had notice of the existence of an unruly crowd on July 10th, the plaintiffs have not established circumstances to impose liability for their injuries.[4]

■ Plaintiffs were harmed on July 11th after speeding in the breakdown lane towards a visible crowd of people standing

4. Plaintiffs contend that an erased Bloomfield police tape of July 10th may establish an adverse inference against the defendants. However, evidence concerning the defendants' notice of the assembly of an unruly

crowd and their conversations concerning crowd control for July 10th does not raise genuine issues of fact concerning any affirmative acts by the defendants on July 11th that would give rise to Section 1983 liability.

in the roadway. Plaintiffs assert that the individual police defendants created or increased the danger for harm by failing to make arrests, failing to follow general crowd control policy, failing to train or supervise the officers, and failing to prevent or suppress the crowd from engaging in acts that disturbed the public peace.

However, the plaintiffs have not shown that the individual police defendants used their authority to commit *affirmative acts* that rendered the plaintiffs vulnerable to a harm that would not otherwise have occurred.

The plaintiffs have provided no evidence of malice, intentional misconduct, or improper motivation on the part of the defendants. No evidence suggests that the police induced the LaMays to speed toward the crowd and attempt to drive through the people in the road, or that the plaintiffs' harm derived from the individual police defendants conspiring with the individuals at the gorge. No evidence indicates that the individual police defendants singled out the LaMays personally for separate treatment. In fact, the plaintiffs were subjected to the same conditions as any other motorist on Route 189.

The Court will not predicate Section 1983 liability for a constitutional deprivation based on the absence of state action to prevent the harm that occurred. Therefore, summary judgment will be granted in favor of the individual police officers to dismiss counts fifteen through twenty.

## C. *Section 1983 Claim Against the Town.*

In count twenty-one, plaintiffs allege that the Town had a policy and custom of failing to train and properly supervise its police officers. Plaintiffs claim that this failure resulted in the officers' decision not to take enforcement action to control the crowd. Plaintiffs assert that the municipality's conduct demonstrates a deliberate indifference to their constitutional rights to be protected from violent confrontations.

A municipality may be held liable pursuant to Section 1983 where the plaintiff's harm was caused by a constitutional violation, and where the municipality is responsible for that violation. *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Failure to train and supervise properly employees "in deliberate indifference" to the rights of its inhabitants establishes a municipal custom or policy actionable under Section 1983. *Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). However, the deficiency in training must be so obvious and so likely to result in the violation of constitutional rights that the policy makers can be said to have been deliberately indifferent to the need for proper training.

As the Supreme Court elaborated, deliberate indifference occurs when police officers have violated constitutional rights so often in exercising their discretion that the need for further training must have become plainly obvious to city policy makers. Merely alleging that the municipality failed to train its employees properly is insufficient to establish a municipal custom or policy. *Neighbour v. Covert,* 68 F.3d 1508, 1512 (2d Cir.1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996).

In this instance, plaintiffs claim that training was deficient because no process was implemented to share information between shifts about what transpired at the gorge, thereby limiting the ability of each successive shift commander to assess the nature of the situation at the gorge. Further, plaintiffs maintain that responding officers could not adequately assess the need to further monitor the crowd because field intelligence had not been uniformly gathered or disseminated. Finally, plaintiffs point to the fact that the police took no enforcement action to disperse the people when the crowd did finally erupt on July 11th.

As noted above, there is no constitutional guarantee of minimal levels of safety

and security except in narrow circumstances. *DeShaney*, 489 U.S. at 195, 109 S.Ct. 998. Thus, the Town's officials cannot be said to have been deliberately indifferent to obvious training deficiencies that were likely to result in the violation of constitutional rights. Therefore, plaintiffs' claims against the municipality for failure to train and supervise properly its officers will fail.

### D. *Plaintiffs' State Law Claims*

Plaintiffs' remaining fourteen counts against the defendant police officers and Town are based on state statutory and common law. Having dismissed all of the federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

### CONCLUSION

For the foregoing reasons, the individual police defendants' and the defendant Town's Motion for Summary Judgment [Doc. No. # 67] is GRANTED. The court declines to exercise supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice. The Clerk is directed to close this case.

SO ORDERED.