**Chantal CRISPIM and Estate of Joshua Daniel Crispim,[1] Plaintiffs,**

**v.**

**Zoe ATHANSON, William Ihne and Jon Horvath, Defendants.**

**No. 3:01CV558 (GLG).**

United States District Court, D. Connecticut.

Aug. 11, 2003.

---

1. We note that, although one of the named plaintiffs in this case is the "Estate of Joshua Daniel Crispim," Joshua is not deceased.

Neil Raymond Johnson, Hartford, CT, for plaintiffs.

Ann F. Bird, Hartford, CT, for defendants.

### MEMORANDUM DECISION

GOETTEL, District Judge.

## I. Introduction

The plaintiffs, Chantal Crispim and The Estate of Joshua Daniel Crispim, of which Chantal is the guardian, have brought this racial discrimination/harassment action against the defendants, Zoe Athanson, William Ihne and Jon Horvath. The complaint consists of eight counts, four of which are asserted by Joshua's estate on

2. Though Joshua's estate has brought claims on his behalf, for simplification purposes, we will refer to those claims and attendant allegations as those asserted by Joshua and not his estate.

his behalf[2] and four by his mother, Chantal. Regarding Joshua the complaint alleges that as a result of racial discrimination, the defendants violated his Federal Constitutional rights under the Fourth and Fourteenth Amendments and his state constitutional rights under Article I, Section 7. He asserts further several state causes of action against the defendants. The four claims that Chantal asserts are derivative of Joshua's claims. The defendants move now for summary judgment [Doc. 15] pursuant to Fed.R.Civ.P. 56.[3] Because we find that no genuine issue of material fact exists as to any of the plaintiffs' claims, and for the reasons set forth more fully below, we grant the defendants' motion for summary judgment as to the Federal Constitutional claims and we decline to exercise jurisdiction over the plaintiffs' remaining state law claims.

## II. Summary Judgment Standard

The standard by which we resolve a motion for summary judgment is well-settled. Summary judgment is proper when, viewed in the light most favorable to the nonmoving party, the record reveals "no genuine issues as to any material fact" and that the moving party is entitled to summary judgment as a matter of law. *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022 (2d Cir.1991) (per curiam); *see* Fed. R.Civ.P. 56(c). "Summary judgment is thus warranted when the nonmoving party has no evidentiary support for an essential element on which it bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, we resolve all ambiguities and draw all reasonable inferences in

3. The motion now before this Court concerns defendants Athanson and Horvath only. It appears from the record that defendant Ihne was never served with process and has not made an appearance in this case. (*See* Defs.' Br. at 3.)

favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is the defendants' burden of showing that no genuine issue of material facts exists. *See Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994).

## III. Factual Background

Joshua is a white male who attended Kennelly Elementary School located in Hartford, Connecticut, in the second and third grades. At all times relevant to this action, defendant Athanson was the school's principal and defendant Horvath was one of its teachers. According to the plaintiffs' allegations, Joshua was harassed and "attacked" by several Black and Hispanic students. Such attacks can be broken down as follows: those that occurred during school hours and on school property, and those that occurred after school hours and off school property.

█ The incidents that occurred during school hours and on school property are asserted rather vaguely by the plaintiff. For instance, he claims that on approximately six separate occasions, when he was the last child in a line of students proceeding through a doorway, the students assigned to hold the door open for the line would "shut it in [his] face" before he could enter or exit the doorway. (Joshua's Dep. at 44–46.) There were three or four students that acted in this manner and they would say things like, "Oops, sorry," when Joshua was finally able to open the door and proceed through it. (*Id.* at 46.) Joshua complained to his teacher about this behavior on several oc-

casions. He told also the school psychologist that certain students were "closing the door on [him] and pushing [him] around." (*Id.* at 49.) Joshua related further that the teacher to whom he complained would, once in a while, take recess away from the offending students as punishment or make them walk in the back of the line. On other occasions, however, his teacher would do nothing at all.[4] (*Id.* at 46.)

Joshua described in his deposition the after school incidents that occurred off school property. He stated: "I would be walking down the street right near [my] house. Each time I got [t]here, the kids would throw me on the grass and start kicking me. Every time I got up, they'd be pushing me. They'd call me names." (*Id.* at 60–61.) He testified further that the six to seven children who perpetrated these physical attacks, which occurred on roughly twelve separate occasions, would call him racially derogatory "white names" like "cracker." (*Id.* at 61, 64.)

In response to the assaults that Joshua had to endure, he and his mother, Chantal, met with defendants Athanson and Horvath at Kennelly Elementary School. At that meeting, Joshua pointed out the children that were harassing him both in and out of school. This prompted defendant Athanson to inform Chantal that the children subjecting Joshua to assault would be reprimanded. According to Chantal, defendant Athanson did speak with those students, but the assaults continued. (Ex. B ¶ 6.) Chantal claims that she met with defendant Athanson ten times following their first meeting and that at each meeting defendant Athanson would promise her that the assaults would be dealt with, but

---

4. There are two vague and conclusory references in the plaintiffs' papers on this motion regarding another in-school incident in which Joshua is alleged to have been hit in the eye with an umbrella. (*See* Pls.' Br. at 8; Ex. B, ¶ 9.) There is no specific allegation regarding this incident in the amended complaint, and nothing in the plaintiffs' papers can cure this basic defect in the pleading. *See Martingano v. Hannon,* Vic. A. No. H 81–2, 1983 WL 1564, at *6 (D.Conn. Sep.29, 1983). We, therefore, decline to consider it.

that the "out-of-school harassments were not her problem." (*Id.* ¶ 10–11.) Approximately one to two weeks following her first meeting with defendant Athanson, Chantal decided to remove Joshua from Kennelly Elementary School. Thereafter, the plaintiffs moved to Vernon, CT, and Joshua enrolled in the public school system of that town. Chantal's claims concern the costs of that move in which she seeks moving and travel expenses, as well as costs pertaining to her increased rent.

## IV. Discussion

Joshua asserts claims based on the Federal Constitution and on state law. First, he claims that the defendants violated his Fourth Amendment right to be free from illegal searches and seizures, which is paralleled with a state search and seizure claim based on Article I, Section 7 of the Connecticut Constitution. Second, he claims that the defendants violated his right to Substantive Due Process and Equal Protection pursuant to the Fourteenth Amendment. These claims are brought via Section 1983. Specifically, each of these claims is based on the plaintiffs' assertion that the defendants had an obligation to protect Joshua from racial "attacks," perpetrated by third parties, that occurred during school hours and on school property, as well as, off school property and after school hours. Following our resolution of the Constitutional claims, we will address briefly the plaintiffs' state law claims.

*Section 1983: Constitutional Claims*

Section 1983 does not create any substantive rights but rather provides a remedy for violations of Constitutional rights or rights under federal law. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906–07 (3d Cir.1997). "To state a claim under section 1983, the plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person

acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, or immunity secured by the Constitution or laws of the United States." *Dwares v. City of New York*, 985 F.2d 94, 98 (2d. Cir.1993); *see* U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

■ The defendants claim that no state action exists here. Contrary to that assertion, the plaintiffs have alleged that the defendants, public school officials performing their discretionary duties, deprived Joshua of his constitutional rights by failing to protect him from racial harassment and assaults, which caused injury to him and his mother. (*See* Comp. ¶¶ 1, 4–10.) We find that the plaintiffs have alleged state action adequately and address now the merits of the Constitutional claims.

*Fourth Amendment and Article I, Section 7 Claims*

■ It is not at all clear to this Court why the plaintiffs reference the Fourth Amendment of the United States Constitution, which concerns unlawful searches and seizures. Even an in-depth reading of the record reveals that there exists not even the slightest factual basis for asserting any claim based on that Constitutional provision. The defendants' motion, therefore, is granted as to count one of the plaintiffs' amended complaint insofar as it relates to any claim brought under the Fourth Amendment.

*Fourteenth Amendment: Due Process*

As we stated above, the plaintiffs claim that the defendants had an obligation to protect Joshua from alleged racial harassment and "attacks" that occurred on school property and during school hours, as well as, off school property and after school hours.

■ This case falls squarely within the well-established principle, as set forth in *DeShaney v. Winnebago Cty. Soc. Servs. Dep't*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), that the Due Process Clause does not burden the state with an affirmative duty to protect its citizens. *Id.; see also D.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993).

In *DeShaney*, the Court declined to impose a Constitutional duty upon the state to protect the life, liberty or property of a citizen from deprivations by private actors absent the existence of a special relationship. *DeShaney*, 489 U.S. at 197–98, 109 S.Ct. 998.

> *DeShaney* involved the state's repeated receipt of reports of abuse of a minor by his father. Notwithstanding the notice provided by the reports to the state agency, it did not remove the child from his father's custody.[5] The father subsequently beat the child resulting in permanent brain damage. The child and his mother filed a § 1983 action against state officials claiming that they deprived the minor of his liberty in violation of the Fourteenth Amendment "by failing to protect him against a risk of violence at his father's hands of which they knew or should have known."

*D.R.*, 972 F.2d at 1369.

This rule, however, is excepted when "certain limited circumstances" are present such that the "Constitution imposes upon the state affirmative duties of care and protection with respect to particular individuals." *DeShaney*, 489 U.S. at 198, 109 S.Ct. 998. Such circumstances, however, have been confined to cases in which the state enters into a special relationship with an individual by engaging in "an affirmative act of restraining the individual's freedom to act on his own behalf [ ] through incarceration, institutionalization, or other similar restraint of personal liberty," *id.* at 200–01, 109 S.Ct. 998, or because the governmental entity itself has created or increased the danger to the individual. *See Dwares*, 985 F.2d at 98–99 (discussing increase of vulnerability exception); *D.R.*, 972 F.2d at 1368–70 (discussing special relationship exception).

■ Courts, in carving out the special relationships exception, have confined it to instances in which custodial relationships between the state and an individual have existed, such as a prison and an inmate or a mental institution and an involuntarily committed patient. *D.R.*, 972 F.2d at 1370–71; *see DeShaney*, 489 U.S. at 198–99, 109 S.Ct. 998 (state may have obligation under Eighth Amendment to protect incarcerated individuals, citing *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (state mental institution has duty under Due Process Clause to protect involuntarily committed patient); *Hutto v. Finney*, 437 U.S. 678, 684, 687, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (state has duty to protect vulnerable inmates where its creation of prison conditions, violating Eighth Amendment, increased danger of violence). Courts have recognized also a special relationship between a social service agency and foster child. *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir.1981) (city social service agency having notice of prior mistreatment has duty to protect child from harm inflicted by foster parents), *ap-*

---

5. "At one point, a court order placed Joshua in the temporary custody of the hospital where he was receiving treatment. A team of specialists determined, however, that there was insufficient evidence of child abuse for the state to retain custody over Joshua." *D.R.*, 972 F.2d at 1369 n. 10.

*peal after remand,* 709 F.2d 782, *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *see also D.R.,* 972 F.2d at 1370–71. We note, however, that negligent inaction by a custodial official does not violate the Due Process Clause. *Daniels v. Williams,* 474 U.S. 327, 332–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (Due Process protections of Fourteenth Amendment are not triggered by lack of due care on the part of prison officials); *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (merely negligent failure to protect one prisoner from another is not sufficient to establish violation of Due Process Clause).

■ Further, courts have recognized Section 1983 liability based on state-created danger where the state, or its agents, commit affirmative acts using their authority to create an opportunity for harm to the plaintiff that would not otherwise have existed. *Dwares,* 985 F.2d at 98; *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996); *LaMay v. Town of Bloomfield,* 62 F.Supp.2d 583, 588 (D.Conn.1999). In other words, if the state's actions increase the vulnerability of a private individual to harm, and that harm occurs, section 1983 liability may be had. The Second Circuit in *Dwares* gave some guidance to the district courts regarding this exception.

In *Dwares,* the plaintiff was "demonstrating in support of the rights of others to engage in flag burning." *Dwares,* 985 F.2d at 96. While doing so, he was attacked physically by a group of "skinheads." *Id.* This attack lasted roughly ten minutes and occurred in the presence of police officers, who made no attempt to intervene. *Id.* The plaintiff brought a Section 1983 action claiming that the officers violated his Constitutional rights. The district court dismissed the complaint. On appeal, the Second Circuit vacated and remanded the case to the district court. It stated, "[w]e read ... *DeShaney* ... to imply that, though an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights." *Id.* at 99. The Court proceeded to find that the complaint in *Dwares*

> was unlike that in *DeShaney* because it went well beyond allegations that the defendant officers merely stood by and did nothing, and that circumstances were merely suspicious. It alleged that the officers conspired with the "skinheads" to permit the latter to beat up flag burners with relative impunity, assuring the "skinheads" that unless they got totally out of control they would not be impeded or arrested. It requires no stretch to infer that such prior assurances would have increased the likelihood that the "skinheads" would assault demonstrators. Thus ... the complaint asserted that the defendant officers indeed had made the demonstrators more vulnerable to assaults. Further, it alleged that the officers had in effect aided and abetted the deprivation of Dwares's civil rights by allowing him to be subjected to the prolonged assault in their presence without interfering with the attack. Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause.

*Id.* Having set forth the relevant legal principles, we determine whether the record supports the existence of a special relationship between the state and Joshua and whether the state increased his vulnerability to attacks.

■ We find here that no special relationship existed between the plaintiff and the state at the time of the alleged harms.

Though school attendance is compulsory in the State of Connecticut, *see* Conn. Gen. Stat. § 10–184, it creates a relationship quite different from that of a prison and inmate or mental institution and involuntarily admitted patient. In Connecticut, it is up to the parents of compulsory-school-age children to decide whether education will take place in the home, or in public or private school. *See D.R.*, 972 F.2d at 1371. Indeed, we agree with the Third Circuit that the primary caretakers of compulsory-school-age children remain their parents, irrespective of the fact that the children are present in school at particular times of the day throughout the school year. While it is clear that children of compulsory-school-age who attend school, regardless of the type of school it is, must submit to the authority of school officials who may engage in disciplinary control over the students, such restriction of freedom does not prevent the students from providing for their basic needs. *See id.* at 1371–72; *see also Sylvia v. Rivera*, No. 547719, 2001 WL 359215, at *6 (Conn.Super.Ct. Mar.14, 2001).

We recognize that at least two district courts within this circuit have found "some duty" of care on behalf of school officials to protect students from physical and verbal abuse by other students, *see Pagano v. Massapequa Pub. Schs.*, 714 F.Supp. 641, 643 (E.D.N.Y.1989), and from "foreseeable risks of injury or loss of life," *see Lichtler v. County of Orange*, 813 F.Supp. 1054, 1056 (S.D.N.Y.1993). We respectfully disagree with those cases based on the restrictive language of *DeShaney* and its progeny, namely, *Dwares* and *D.R.*, and note that the Second Circuit has yet to decide whether the student-school relationship is of the sort that would obligate the state to protect its students, thereby extending to the students a Substantive Due Process right to that protection. That said, it is this Court's opinion that the Due Process Clause demands no such obli-

gation under the circumstances of this case.

Further, the plaintiffs have failed to show that the defendants' actions created a danger or made Joshua more vulnerable to attacks. They rely fully on their allegations that the defendants *failed to act* in the first instance. Absent affirmative acts on behalf of the state to create a danger or make an individual more vulnerable to harm, liability cannot be imposed upon the state. *See LaMay*, 62 F.Supp.2d at 588 (holding under *Dwares* that nonfeasance does not give rise to Section 1983 liability).

Having failed to show the existence of a special relationship between the defendants and Joshua, or that the defendants' affirmative acts created a danger or made him more vulnerable to a harm of which he suffered, Joshua's Due Process claim, as part of count one, presents this Court with no genuine issue of material fact. Summary judgment, therefore, is granted in favor of the defendants in that regard.

*Fourteenth Amendment: Equal Protection*

Based on the same allegations that formed Joshua's Due Process claim, namely, the defendants alleged obligation and failure to protect him from verbal and physical racial harassment in and out of the school environment, Joshua asserts a claim alleging a violation of his right to Equal Protection.

■ To state a valid equal protection claim of this genre, wherein a plaintiff attempts to hold school officials liable for race discrimination based on their responses to such harassment, *in the school environment,* of a student by other children or parents, proof of racially discriminatory intent is required. *See Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir.1999) (emphasis added); *Silver*, 947 F.2d at 1022. To prove such intent, the

plaintiff must show "deliberate indifference on the part of the defendants themselves." *Gant*, 195 F.3d at 140. The school officials' actions or inactions, in light of the known circumstances, can show deliberate indifference. *Id.* at 141. For instance, "deliberate indifference can be found when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances. The Supreme Court has pointedly reminded us, however, that this is not a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Id.* (Citations omitted; internal quotation marks omitted).

■ The incidents that occurred in the school environment concern only the several incidents where certain students shut the door on Joshua just as he was entering or exiting a doorway. Our careful scrutiny of the record reveals that these incidents seem to have been nothing more than adolescent bullying, even in light of the known circumstances. There are very few details on the record from which to determine otherwise. For instance, there is no information about the offending students' names, race, or any other identifying features. The only details present concern what the offending students would say to Joshua after he was able to open the particular door he wished to move through. They would say sarcastically, "Oops, sorry," as if to suggest they were unaware of Joshua's presence when they closed the door. Significantly, there is virtually nothing to suggest that these incidents were racially motivated. Absent sufficient factual support, it would be a stretch for this Court to label these acts as racially moti-

vated and fanciful to conclude that the plaintiffs have shown that the defendants demonstrated the requisite intent to discriminate against Joshua.[6]

The basis of our determination remains clear even in light of the defendants' knowledge that Joshua was being harassed outside of the school environment because the defendants' response to the in-school incidents were not "clearly unreasonable." It cannot be said fairly in the first instance that the in-school occurrences constituted discrimination that was known to the defendants. Also, the offending students were punished by having their recesses taken away once in a while, or were made to walk at the back of the line. And, Chantal concedes that defendant Athanson spoke with the offending students about their behavior. Though the defendants could have levied more severe punishments upon the offending students, such as detention, suspension, or the like, we do not think that their responses to the incidents were clearly unreasonable in light of the known circumstances of this case.

■ Insofar as the out of school incidents are concerned, they do not implicate the Equal Protection Clause in this situation. *See Gant*, 195 F.3d at 140 (Heavy burden of showing deliberate indifference on behalf of school officials to racial discrimination within the school environment implies that the Equal Protection Clause does not extend beyond the school environment).

Because we conclude that the plaintiffs have failed to show that the defendants intended racial discrimination against

---

6. We note that in the plaintiffs' overly redundant, repetitive forty-three page brief, they allude to what seems to be numerous racially motivated attacks and harassments. The plaintiffs state, for example, that the incidents of "severe" and "incessant" racial harassment "includ[e] but [are] not limited to" those described. This phrase occurs no fewer than sixteen times throughout the plaintiffs' brief. Our review of the record, however, reveals, indeed, that the incidents were quite limited rather than "incessant" and, in constitutional terms, somewhat innocuous rather than "severe."

Joshua to occur, if it occurred at all, they have failed to show a necessary element of their Equal Protection claim, thereby rendering our grant of summary judgment appropriate as to that claim.

*State Law Claims*

 Having dismissed the federal claims in this action, we are left with state claims only. In such instances, we must decide whether to assert pendent jurisdiction. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court stated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." This rule is not absolute, however, and the "District Court may exercise its discretion in deciding whether to dismiss the pendent state law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Bonovich v. Knights of Columbus,* 963 F.Supp. 143, 149 (D.Conn.1997). There are several factors a federal court must weigh in resolving whether to exercise pendent jurisdiction. It is proper to "hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants." The court should decline to exercise pendent jurisdiction, however, when state law issues would predominate the litigation. *Id.* at 726, 86 S.Ct. 1130. Although this Court has the discretion to retain jurisdiction and hear the plaintiff's state law claims, it declines to do so in this case. *See Spear v. Town of West Hartford,* 771 F.Supp. 521, 530 (D.Conn.1991) ("absent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendent state law claims on the basis of a federal question claim already disposed of"), *aff'd,* 954 F.2d 63 (2d Cir.), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992).

## V. Conclusion

Because no genuine issue of material fact exists as to any of the plaintiffs' Federal Constitutional claims, we **GRANT** the defendants' motion for summary judgment [Doc. 15] as to those claims and we decline to exercise jurisdiction over the plaintiffs' remaining state law claims. The clerk is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**