### Rhodora YAP, on behalf of Edward Yap, an infant, Rhodora Yap, Individually, Plaintiffs,

### v.

### OCEANSIDE UNION FREE SCHOOL DISTRICT, Herb Brown, Individually and in his official capacity as Superintendent of the Oceanside Union Free School District, Karen Siris, Individually and in her official capacity

as Principal of the W.S. Boardman Elementary School (School No. 9E), Adriana Gonzalez s/h/a Mrs. Gonzalez, Individually and in her capacity as an employee of the W.S. Boardman Elementary School, Defendants.

No. CV 01–5708(DRH)(MLO).

United States District Court,
E.D. New York.

Feb. 2, 2004.

Goldstein & Avrutine, Syosset, NY, By Daniel J. Millman, for Plaintiffs.

Kaufman, Borgeest & Ryan, LLP, New York City, By Lee E. Berger, Jonathan B. Bruno, for Defendants.

### MEMORANDUM AND ORDER

HURLEY, District Judge.

Plaintiffs have initiated this action, pursuant to 42 U.S.C. § 1983, for alleged violation of their constitutional rights by a elementary school principal, a school district superintendent and a lunch room

monitor. Defendants have submitted a motion for summary judgment pursuant to Rule 56. Plaintiffs have filed a cross-motion pursuant to Rule 15(a) for leave to file an amended complaint as to a state law claim. For the reasons discussed *infra,* the Rule 56 motion is granted and Plaintiffs Rule 15(a) motion is denied.

## I. BACKGROUND

In evaluating a summary judgment motion, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Since the instant summary judgment motion was initiated by Defendants, the Court interprets the proffered undisputed facts, and the related factual inferences, in the light most favorable to Plaintiffs.

Plaintiff Edward Yap ("Edward") is a child of Asian-American ancestry. In September 1995, at the age of six, Edward began attending first grade at the W.S. Boardman Elementary School ("School"). The School is a part of the Oceanside Union Free School District ("District" or "School District").

Edward withdrew from the School to attend second grade at Saint Christopher's, a private religious school located in Baldwin, New York. At that time, Edward's parents withdrew him from the School because they wanted him to experience a religious education. Edward returned to the School in the third grade because he missed his friends. Edward reported no problems during first or third grades at the School.

In September 1998, Edward began the fourth grade at the School. At this time, Edward began to experience difficulty with certain other students. According to Edward's mother, Rhodora Yap ("Rhodora"), beginning in September 1998 "some of the other students were calling him names, cursing at him, making fun of him because he is chinese and hitting him." Rhodora Aff. ¶ 5. The name-calling included referring to him as "chinese asshole" and as a "chinese bitch." *Id.* Both Rhodora and Edward told Edward's teacher about the name-calling. Rhodora Aff. ¶ 6. Edward also alleges that he was once "slapped in the face, thrown into the emergency exit of the bus and repeatedly punched by boys while the girls cheered on." *Id.* Although Rhodora alleges that Edward's resultant pain was treated by his father with acupuncture and medicine, there is no indication that any authority, whether in the school or elsewhere, was informed of this incident. *See id.*

In May 1999, Rhodora spoke with Karen Siris ("Siris"), the principal of the School. At that time, Rhodora informed Siris "that Edward was being subjected to repeated racial harassment; racial teasing[,] taunting and racially motivated physical abuse." Rhodora Aff. ¶ 7. Immediately following this conference, Siris met with Edward and the children that allegedly harassed him to discuss the incident. Siris was told by the purportedly abusive children that Edward had provoked the incidents. Siris Aff. ¶ 17. Siris decided that all of the involved children should discuss the incidents further. *Id.* Siris required all of the children eat their lunch in her office in lieu of going to recess. *Id.* At this lunch-time discussion, one of the accused children admitted to making a racial remark about Edward. *Id.* Due to this admission, Siris met in person with the admitting child's father to discuss the seriousness of the event. *Id.* At this follow-up meeting, Siris told the admitting child's father that such conduct was "inappropriate and unacceptable" and asked for the father's "assistance

in preventing further incidents from happening in the future." *Id.*

Edward maintains that the abuse recommenced within a few days. Edward Aff. ¶ 10. Edward maintains that he mentioned this continued abuse to Siris at some unspecified time. *Id.* Although Edward states that he mentioned the harassment to both his teacher and Siris "on numerous occasions," Edward Aff. ¶ 11, and Rhodora also claims that she made several complaints to Siris at unspecified times during that year, Rhodora Aff. ¶ 7, Plaintiffs have not disputed Siris statement that she had never spoken to either of Rhodora or Edward about and racial incidents prior to May 1999, *see* Siris Aff. ¶ 17. In fact, Edward's own deposition testimony indicates that he made no complaints to anyone in the school until May 1999. *See* Edward Dep. at 111.

At this point it is helpful to discuss Siris' background and training. Siris possesses a doctorate in Educational Administration from Hofstra University. *See* Siris Aff. ¶ 5. In preparation for that degree, Siris spent two years preparing a doctoral dissertation entitled: "Using Teacher Action Research to Alleviate Bullying and Victimization in Schools." *Id.* This dissertation won the award for "Doctoral Dissertation of the Year" from Hofstra University. *Id.*

Siris has been working as an educator, in both teaching and administrative roles, since 1972. *See* Siris Aff. ¶ 4. Siris has been employed as the principal of the School since 1996. *See* Siris Aff. ¶ 3. Upon being appointed as principal of the School in 1996, Siris "instituted and promoted a 'Caring Majority' mission and 'Anti–Bullying' philosophy whereby students are encouraged to be part of the caring majority to help other students who may need help and to report any incidents of verbal or physical harassment of any nature." *See* Siris Aff. ¶ 8. This "mission" and the asso-

ciated "Anti–Bullying" philosophy are supported via presentations that Siris makes to each classroom at the beginning of each school year and also via written materials that are given to each teacher for use throughout the school year. *See id.* Siris also discusses these topics at the monthly faculty meetings. *See* Siris Aff. ¶ 9. At the beginning of each year, the entire school is required to watch "a motivational film presentation that promotes nonviolence, kindness, racial equality and respect for disabilities." *See* Siris Aff. ¶ 10. After viewing the film, teachers "conduct follow-up activities" consistent with teacher's guides that were prepared in conjunction with the film. *See id.*

Under Siris' stewardship, the District has also developed certain written materials. These materials included the "Students Rights & Responsibilities" handbook ("SR & R Handbook"). *See* Siris Aff. ¶ 11. The SR & R Handbook contains a code of conduct which is discussed and distributed during meetings with the students' parents. *See id.* Siris also created the "Parent Child Handbook." *See* Siris Aff. ¶ 12. Siris encouraged all teachers at the School assign a homework assignment whereby all students took this handbook home to discuss it with their parents. *See id.* With all of this background on Siris in mind, the Court returns to Edward's experiences at the School.

When Edward began fifth grade, the incidents with his classmates continued. In general, these incidents with Edward's classmates purportedly included the same racial name-calling as had been reported in the fourth grade. Edward Aff. ¶ 13. Also reviewing the allegations in general, the fifth grade incidents included physical "abuse" of an unspecified nature. *Id.* (To the extent that Plaintiffs have described these physical confrontations, the Court will address them specifically herein.)

Moreover, the fifth grade confrontations between Edward and his classmates included a practice of making faces at Edward that requires some explanation. Edward states that certain unspecified classmates would sometimes "pull the outer edge of their eyes toward the back of their head with their fingers to make themselves look asian and make fun of me." *Id.* Apparently, this practice was used to approximate the facial characteristics of those with asian ancestry; specifically, the morphology of the eyes that are sometimes associated with asian ancestry. In general, Edward contends that he told Siris about these encounters on "numerous occasions." Edward Aff. ¶ 14.

In October 1999, Edward maintains that an incident with other students ended with one student pushing Edward down on the floor and hitting him. Edward Aff. ¶ 15. Both Edward and Rhodora met with Siris to complain about this incident. In response, Siris:

> met with the students and explain[ed] that name-calling and teasing is hurtful and potentially destructive behavior that is not acceptable in school or on the school bus. [Siris] also called the children's parents to discuss the incident and reiterate what [she] told the children. [Siris] asked the parents to speak to their children about their conduct in order to prevent any further incidents from happening in the future. As a form of discipline, the children involved in the incident, except for Edward, had to eat lunch with [Siris] in [her] office and were suspended from recess. Edward was never given a consequence over the [ ] incident.

Siris Aff. ¶ 19. Within a few days of Siris' actions, the child who purportedly pushed and hit Edward came to the Yap house and apologized in person. Edward Aff. ¶ 15.

On some unspecified date, Edward claims that he was "thrown out of [his] seat and, while another student stepped on [his] upper back, another stepped on [his] lower back." Edward Aff. ¶ 16. Edward does not contend that any name-calling, racial or otherwise, occurred during this incident. *See id.* Edward does contend that he told Siris about this incident "right after it happened." *Id.*

In December 1999, "several students pushed [Edward] down a flight of stairs inside the school while making [unspecified] racial remarks about [his] asian heritage." Edward Aff. ¶ 17. Edward "warned these students that [he] was going to tell Ms. Siris if they didn't stop. [One of the individuals] responded 'go ahead we don't care.'" *Id.* Edward claims that his father treated him for pain after this incident. *Id.*

Edward and Rhodora both complained about this event to Siris. Edward maintains that he complained to Siris on three separate occasions about this specific incident. Edward Aff. ¶ 17. Since Edward could not identify the individuals responsible for the incident, Siris took him to each fourth grade classroom to "address the issue." Siris Aff. ¶ 20. In each classroom, Siris told the assembled students "that name-calling and teasing of any form is not acceptable behavior at [the School] and, as a learning tool, [she] asked the children for their comments and suggestions on what should be done in response to Edward's complaint." *Id.* After the first classroom visit, Edward began crying. *See* Edward Aff. ¶ 18. While Edward did not tell Siris that he wished to stop talking to these classes, *see id.;* Siris Aff. ¶ 20, he maintains that Siris should have deduced his wish to stop from the fact that he was crying, *see* Edward Aff. ¶ 18. Despite the tears, Siris and Edward continued their classroom visits. In response to the visits,

Edward received several letters from students indicating "that they felt bad about what happened." Edward Aff. ¶ 18; *see also* Siris Aff. ¶ 20.

A few weeks later, Edward claims that he was assaulted again. Edward Aff. ¶ 19. During this incident, Edward alleges that he was shoved and kicked while his attackers "engag[ed] in racial name-calling and taunting." *Id.* Edward also alleges that the attackers "made 'slanty eyes' jokes, pulling the outer edge of their eyes toward the back of their head with their fingers." *Id.* After this incident, Edward was taken to a physician due to complaints of pain. *Id.* The physician informed him that the pain would subside but made no other diagnosis. *Id.* Confusingly, Edward maintains that he told Siris about this incident at the same time that he told her about the incident on the stairs, which occurred weeks earlier. *See* Edward Aff. ¶ 20.

Whenever the conference with Siris occurred, it is undisputed that the named attackers were brought to Siris' office shortly thereafter.

The students denied Edward's allegations and accused Edward of starting up with them on the school bus. [Siris] explained to the children the seriousness of the incident and the negative effect of their words and actions. After talking to the children, [Siris] met with the children's parents and discussed the seriousness of the incident and Edward's complaints. The students' parents told [Siris] to stop blaming their children and accused Edward of starting up with their children. [Siris] advised the parents about the seriousness of Edward's allegations and that the described behaviors of their children were inexcusable and not permitted at [the School]. Over many, if not all of the parents' objections, [Siris] disciplined the children by requiring that they eat lunch in the principal's office; [Siris] suspended them from recess for five days and [Siris] also suspended [the named attackers] from riding on the school bus for five days.

Siris Aff. ¶ 22; *see also* Siris Aff., Ex. D. Edward received no discipline. *Id.*

In January 2000, an unnamed classmate pushed Edward and "stomped" on his back. *See* Edward Aff. ¶ 21. Edward mentions no taunting or racial name-calling in association with this incident. *See id.* Due to the pain Edward felt from this "stomping," his father wrote a note excusing him from gym class. *Id.* Rhodora complained about this event to Siris on some unspecified date. Rhodora Aff. ¶ 18. One week after this incident, Edward told Rhodora, "Mommy, I am going crazy," while he held his head. Rhodora Aff. ¶ 19. At some point after this statement, Rhodora and her other son met with Siris and told her that the harassment was "getting out of control," and informed Siris that Edward had obsessive compulsive disorder. *Id.* On January 26, 2000, Edward met with Siris and informed her that he did not want to go back to school. *See* Edward Aff. ¶ 23. The record does not indicate whether Edward told Siris why he wished to leave. *See id.* Whichever reason, if any, was proffered, both Siris and Edward's family encouraged him to return to school. *See id.* At one of these meetings, Rhodora suggested that the school should install hidden cameras on the bus to monitor these incidents. *See* Rhodora Aff. ¶ 24. Siris denied this request as against school policy. *See id.*

In response to these meetings with the Yap family, in March 2000, Siris gathered the entire fifth grade in the cafeteria and "discussed with them the dangers of racial name-calling, stereotyping and teasing,

and re-emphasized the importance of tolerance." Siris Aff. ¶ 23.[1]

At certain indeterminate points in the 2000 school year, Edward asked a teacher to transfer him to a different home room so that he could be closer to certain friends. *See* Edward Aff. ¶ 24. This request was denied by the teacher. *Id.* There is no indication that this request was ever relayed to Siris.

Similarly, at some indeterminate point during the fifth grade, Edward alleges that he was pushed by an unnamed student. *See* Edward Aff. ¶ 29. Edward states that this shove was "for no reason." *See id.* Edward also states that he shoved this unnamed student in retaliation. *See id.* Edward does not state that Siris or any other authority figure was told about this event. *See id.*[2]

Returning to the timeline of events, in May of 2000, another incident occurred. Edward, who was at his locker, observed the lunchroom monitor named Adriana Gonzalez ("Gonzalez") looking at him while talking to another monitor. Edward Aff. ¶ 27. Edward describes Gonzalez's comments as follows:

> "he's a rotten liar," called me a "freakin' chinese liar" and said "his family is crazy." She also told me to go back to where I came from. She also said "now you're going to cry to Ms. Siris if you're still alive" and told me to go back to my own crazy world where I think that everything goes my way.

*Id.* Edward and Rhodora both complained to Siris about this incident.

The day of the first complaint, Siris interviewed all of the witnesses that Edward had identified. Siris Aff. ¶ 26. While the witnesses confirmed that Gonzalez referred to Edward's "crazy lie[s]" and referred to the Yap family as "crazy," they did not confirm Edwards allegations that his life was threatened or that his ethnicity was even mentioned. *See* Gonzalez Aff, Ex. B at 1; Siris Aff. ¶ 26. On the same day, Siris interviewed Gonzalez about the incident. *See* Siris Aff. ¶ 27. Gonzalez explained that she had talked to Edward about disregarding an instruction at recess but denied making any racial or life-threatening remarks. *See id.* Siris also interviewed the other lunchroom monitor that was on duty that day. *See* Siris Aff. ¶ 28. This individual also denied that any racial or life-threatening remarks were ever made. *See id.*

Based upon all of these interviews, Siris concluded that "Gonzalez exercised poor judgment by making inappropriate, although not racial, comments about Edward." *See id.* Siris then conferred with Dr. Herb Brown, superintendent of the Oceanside Union Free School District ("Brown"), about the incident. *See* Siris Aff. ¶ 29. Brown and Siris agreed that a letter should be sent to Gonzalez documenting the incident and warning her about future incidents. *See id.* A copy of the letter was placed in Gonzalez's personnel file. *See id.* Three weeks after the incident, Rhodora and Edward were

---

1. In general, Edward and Rhodora were both unhappy with how Siris responded to their complaints. For example, at some indeterminate point, Edward reported being punched in the chest. *See* Edward Aff. ¶ 25. When the event was relayed to Siris via Rhodora, Siris stated that the incident may be an example of "teasing." *Id.* Edward thought that this characterization was unreasonable. *Id.* Edward

also indicated that Siris was sometimes "nasty" and would suggest that he was somehow at fault for the incidents. *See* Edward Aff. ¶ 26.

2. Edward does contend that he complained to Siris "well over thirty" times in total about racial name-calling and physical attacks. *See* Edward Aff. ¶ 31.

unhappy to find that Gonzalez was still assigned to Edward's class. *See, e.g.,* Edward Aff. ¶ 28. Rhodora called to complain. *See id.* Siris then immediately transferred Gonzalez to another class. *See id.;* Siris Aff. ¶ 29. At Gonzalez's end-of-year-evaluation, reference was made to this incident. *See* Siris Aff. ¶ 29.

"[N]ear the end of May[ ] 2000," the Yap family visited with Brown. Edward Aff. ¶ 32. At this meeting, Brown was informed about the alleged racial name-calling and physical abuse. *See* Edward Aff. ¶¶ 32–34. The Yap family also made two requests: that Edward be allowed to skip a grade or that he be transferred to specific other school within the School District. *See* Edward Aff. ¶¶ 36–37. Brown forwarded both requests to school board for consideration. *See* Brown Aff. ¶ 11.

The school district, in keeping with their longstanding policy, initially denied both requests. *See* Plaintiffs' Mem. at 9; Edward Aff. ¶ 38; Siris Aff. ¶ 33. Brown communicated the School Board's denial of both requests to Rhodora in July 2000. *See* Rhodora Aff. ¶ 36. Instead of the requested remedies, "differentiated instruction" was offered to meet Edward's academic needs. *See* Siris Aff. ¶ 33. Plaintiffs appealed the denial of a transfer to the New York State Board of Education. *See* Siris Aff. ¶ 35. Prior to the rendering of any decision by the New York State Board of Education, Defendants offered Edward a transfer to his requested school. *Id.* Rather than accepting either the differentiated instruction or the transfer, Edward voluntarily withdrew from the School. *See* Siris Aff. ¶ 34. Edward now attends a private school. *See* Edward Aff. ¶ 44.

Plaintiffs commenced this action on August 23, 2001, by filing a complaint. The complaint alleges that Edward's rights under the equal protection clause were violated by Defendants' non-action and acquiescence to the alleged abuse. *See* complaint ¶ 21. The complaint further alleges that Edward's due process rights were violated by Defendants' non-action and acquiescence to the alleged abuse. *See* complaint ¶ 29. As a third cause of action Plaintiffs allege that unspecified "constitutional rights" were violated by the customs and policies of Brown, Siris and Gonzalez. *See* complaint ¶ 46. Rhodora then re-alleges these three causes of action on her own behalf. *See* complaint ¶¶ 48–53. Plaintiffs also allege state law negligence by Defendants. *See* complaint ¶¶ 55, 60, 65.

Defendants have filed the instant motion summary judgment. In response, Plaintiffs have filed a cross-motion for leave to amend the complaint with regard to the state-law claim. On June 26, 2003, the Court received these fully briefed cross-motions.

## II. DISCUSSION.

### A. The Summary Judgment Standard.

Defendants initiated the instant motion under Federal Rule of Civil Procedure 56. The legal principles employed by the Court when ruling upon a motion for summary judgment are well-established. Summary judgment may be granted only when it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The moving party bears the initial burden "of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, the non-moving party "must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed. R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule*, 85 F.3d at 1011. In reviewing these materials, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Id.*

## B. Plaintiffs' Federal Claims.

### 1. Plaintiffs' Equal Protection Claims Based Upon Defendants' Purported Indifference to Actions by Other Students.

■■■ For Defendants to "be held liable for race discrimination—in violation of the Fourteenth Amendment . . .—based on their responses to harassment, in the school environment, of a student by other children or parents . . . . [Plaintiffs] must show deliberate indifference on the part of the [D]efendants themselves." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir.1999). "Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances." *Id.* Viewed in the light of these circumstances, "deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Id.* (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). In short, the undisputed evidence that must allow a reasonable trier of fact to conclude "that the defendant[s'] indifference was such that the defendant[s] intended the discrimination to occur." *Gant*, 195 F.3d at 140.

■ As both the Supreme Court and the Second Circuit have stressed, this "deliberate indifference" standard is " 'not a mere reasonableness standard' that transforms every school disciplinary decision into a jury question." *Id.* To the contrary, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . , could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* With this standard in mind, the Court turns to Defendants' purported deliberate indifference.

The evidence, construed in Plaintiffs' favor, reveals that Edward has suffered through an extremely unpleasant experience. If all of Edward's allegations are believed, these experiences involved a significant amount of racial name-calling and physical abuse. It is undisputed that Plaintiffs brought this abuse to Defendants' attention and that action was taken by Defendants. These actions ran the gamut from informal talks with the accused—to the loss of lunch and recess privileges—to the outright suspension of the accused from any use of the school buses. Regrettably, these measures were insufficient to completely end the abuse. However, the ultimate failure of these measures does mean that Plaintiffs have created a jury question with regard to deliberate indifference. *See Crispim v. Athanson,* 275 F.Supp.2d 240, 248 (D.Conn.2003) (granting summary judgment in spite of an argument that the school's remedial and preventative measures proved insufficient).

■■■ Rather, the Court must take care to "refrain from second-guessing the disciplinary decisions made by school administrators." *Davis,* 526 U.S. at 648, 119 S.Ct. 1661. It is certainly possible that a school's response to the circumstances alleged herein could be so inadequate that

they would constitute a deliberate indifference to Edward's rights. However, the undisputed facts before the Court do not set forth such circumstances. The undisputed facts detail dozens of punishments levied by Siris and a near equal number of passive interventions—such as presentations and workshops regarding bullying and intolerance. The Court has also considered the refusal by the District to allow Edward to either transfer schools or to skip a grade in contravention of a indisputably well-established custom to the contrary. However, the Court notes that there was no evidentiary proffer that either of the requested remedies would alleviate the problems reported by Edward. For example, there is no indication that the racial make-up of the next grade would have been more favorable. In fact, Edward's own allegations indicate the harassment occurred across the lines of the individual grades. There has similarly been no proffer that the situation in the requested transfer school would somehow provide a superior situation to the School.

With these observations in mind, the ultimate failure of these punishments and decisions to adequately address Edward's allegations, while certainly relevant, does not alter the result of the Court's inquiry. Deliberate indifference, in this context, requires something more than a proffer indicating the ultimate inadequacy of preventative and curative measures. Instead, the measures taken must be so inadequate that a degree of discriminatory intent may be inferred—allowing the trier of fact to conclude that Defendants intended for the discrimination to occur. *See Gant*, 195 F.3d at 140.

■ The circumstances of this case, as established by the undisputed facts, would permit no reasonable trier of fact to reach that conclusion. To the contrary, the proffered facts detail a situation where a school district doggedly but unsuccessfully attempted to address serious allegations of racial name-calling and physical abuse. The ultimate failure of the District's punitive and preventative measures do not alter the fact that, in light of all of the attendant circumstances, the actions taken were reasonable attempts to address the reported problems. Similarly, the failure of Defendants to break their indisputedly long-standing policies regarding transfers and class-acceleration were not unreasonable in light of the proffered information. In short, the proffered facts, even when drawing all inferences in Plaintiffs' favor, do not permit a reasonable trier of fact to conclude that Defendants exhibited deliberate indifference. For this reason, summary judgment is appropriate with regard to Plaintiffs' Equal Protection claims.

 2. Plaintiffs' Substantive Due Process Claims Against the District, Siris and Brown.

■ It is well settled that Plaintiffs may only allege cognizable substantive due process claims for extreme or egregious conduct which can be fairly viewed as so " 'brutal' and 'offensive to human dignity' " that it shocks the conscience. *See Johnson v. Glick*, 481 F.2d 1028, 1033 & n. 6 (2d Cir.1973) (Friendly, J.) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)), partially abrogated on other grounds by *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Second Circuit has explained that "[s]ubstantive due process protects against governmental action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994).

■ Plaintiffs have proffered no case law wherein the alleged failure of a school

to adequately discipline its students met this substantive due process threshold. The Court's independent research has similarly failed to reveal any such case law. This does not mean that such a claim is impossible as a matter of law. Instead, the Court merely notes the absence of such case law as illustrative of how difficult it is to reach the relevant threshold in the instant context. With that difficulty in mind, the Court considers the undisputed facts in this case.

The Court has again considered all of the proffered evidence. For substantially the same reasons discussed *supra*, the Court concludes that no reasonable trier of fact could find, under these circumstances, that Defendants' actions in failing to adequately address Plaintiffs' complaints and failing to break their well-established transfer and class-acceleration rules at Plaintiffs' request, met the substantive due process threshold. Therefore, the Court finds that summary judgment is appropriate under the proffered facts as to this claim as well.

### 3. Plaintiffs' Substantive Due Process Claims Against Gonzalez.

As Plaintiffs stress, *see* Plaintiffs' Mem. at 18–19, their claims against Gonzalez do not stem from any purported deliberate indifference to Edward's rights through failing to prevent the actions of other students. Instead, Plaintiffs' substantive due process claims against Gonzalez are based upon the affirmative comments that she was alleged to have made. *See id.* These allegations require a slightly different analysis.

■ As stated *supra*, Plaintiffs may only allege cognizable substantive due process claims for extreme or egregious conduct which can be fairly viewed as so "'brutal' and 'offensive to human dignity'" that it shocks the conscience. *Johnson,*

481 F.2d at 1033(2d Cir.1973) (quoting *Rochin,* 342 U.S. at 172, 72 S.Ct. 205); *see Smith ex rel. Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). There is significant case law on what conduct by an individual school official is sufficiently egregious to meet this standard. For example, in *Smith,* the Second Circuit ruled that, in light of all of the relevant circumstances, a single slap by a teacher to the face of a student did not satisfy the standard. 298 F.3d at 173. By way of contrast, in *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246 (2d Cir. 2001), the Second Circuit denied a teacher qualified immunity from a student's due process claim where that was alleged to have teacher grabbed the student by the throat, lifted him off the ground by his neck, dragged him across the floor, choked him, slammed his head into the bleachers four times, rammed his head into a metal fuse box and punched him in the face. 239 F.3d at 249–54.

The cases discussed above involved significant violence on the part of the school officials. Nonetheless, the Second Circuit has taken pains to emphasize that the type of violence—e.g., a slap as compared to a punch—does not define whether a substantive due process violation has occurred. *See Smith,* 298 F.3d at 173. Moreover, there is no indication in the case law that the presence of some violence is critical to an allegation that a teacher violated a student's substantive due process. *See, e.g., id.* Therefore, although no violence by Gonzalez is alleged, the Court does not apply any per se rule to its evaluation of Gonzalez's conduct toward Edward. Instead, the Court evaluates Gonzalez's statements on their face, drawing all inferences in Plaintiffs' favor, to ascertain whether the proffered facts would allow a reasonable trier of fact to conclude that the relevant standard has been met.

Construing the facts in Plaintiffs' favor, Gonzalez said the following:

> "he's a rotten liar," called me a "freakin' chinese liar" and said "his family is crazy." She also told me to go back to where I came from. She also said "now you're going to cry to Ms. Siris if you're still alive" and told to go back to my own crazy world where I think that everything goes my way.

Edward Aff. ¶ 27.

The racial elements of these statements are the reference to Edward as a "chinese liar" and the direction to "go back to where [he] came from." The other serious aspect of this statement is the "now you're going to cry to Ms. Siris if you're still alive." These are all serious statements that should not, in a perfect world, ever be said to an elementary school student by anyone, let alone a school official. However, in the pantheon of regrettable utterances, these statements are by no means the most serious.

First, the Court notes that a portion of Gonzalez's alleged statements are amenable to reasonable race-neutral interpretations. For example, viewed objectively, Gonzalez's first statement, rather than being a common epithet, relied upon Edward's individual capacity for truth rather than his ethnic origins. Also, the last statement, referencing Edward's life, while certainly ominous, does not betray any facial racial animus. The Court does not rely upon these alternative interpretations. In the evaluation of these statements' seriousness, however, it is important to note that some of these statements are open to reasonable race-neutral interpretations.

In addition to these alternative interpretations, the Court has also considered the frequency of the statements—one single transaction—and the context in which they were made. The context of these statements is particularly interesting. Accord-

ing to Edward, some portion of the comments attributed to Gonzalez were not even directed toward him. *See* Edward Aff. ¶ 27. Rather, some indeterminate portion of these statements were part of a private conversation that Edward overheard. *See id.* Finally, the Court has considered the facial severity of these statements, construed wholly in Plaintiffs' favor. Viewed thusly, these statements are not so egregious that a reasonable trier of fact could conclude that they are so " 'brutal' and 'offensive to human dignity' " that they shock the conscience. *See Johnson*, 481 F.2d at 1033. Therefore, summary judgment is appropriate as to this claim.

### 4. Policy, Practice or Custom.

 Defendants also contend that Plaintiffs have failed to proffer adequate evidence of a policy, practice or custom that would satisfy the requirements of 42 U.S.C. § 1983. *See* Defendants' Mem. at 22. The Court has already addressed the merits of the purported constitutional violations and found them insufficient to survive the instant summary judgment motion. Since "[i]t is fundamental that [Section] 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights," the Court does not reach Defendants' policy, practice or custom arguments. *Rosa R. v. Connelly*, 889 F.2d 435, 440 (2d Cir.1989) (citing *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617–18, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)).

### 5. Qualified Immunity.

The Supreme Court has encouraged lower courts in appropriate circumstances "to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all," before reaching the question of whether the right was clearly estab-

lished at the time. *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Since, as discussed *supra,* the Court concludes that no reasonable trier of fact could conclude that constitutional deprivations occurred, the Court does not reach the qualified immunity analysis.

6. Rhodora's Individual Claims.

■ Defendants argue that Rhodora lacks standing to assert a personal violation of her own substantive due process and equal protection rights via the inattention to Edward's rights. *See* Defendants' Mem. at 27. This contention is amply supported by the case law. *See Morgan v. City of New York,* 166 F.Supp.2d 817, 819 (S.D.N.Y.2001). Plaintiffs contend that Rhodora's own individual interest in the care, custody and management of her child was violated by Defendants' conduct. *See* Plaintiffs' Mem. at 24–25. In support of this contention, Plaintiffs have cited a Supreme Court case that stands for the proposition that parent has a right to participate in a hearing that would end or otherwise truncate parenting rights, *see Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), a citation to a non-existent aspect of the New York State Social Services Law, *see* N.Y. Social Services Law 384–b(1)(a) [sic] (McKinney's 2003), and a case wherein a high school student sought to assert his father's first amendment rights in order to allege retaliation, *see Dangler on Behalf of Dangler v. Yorktown Cent. Schools,* 771 F.Supp. 625, 630 (S.D.N.Y.1991). Read carefully, these cases provide dubious authority for the proposition that Rhodora possesses an individual right to assert a constitutional claim based upon the pur-

ported denial of Edward's rights. However, the Court need not reach this issue.

According to Plaintiffs' own brief, Edwards and Rhodora's rights are "inextricably bound up with one another." Plaintiffs' Mem. at 25 (internal quotation marks omitted). Therefore, even if the Court recognized Rhodora's individual claims, they are dependent upon some violation of Edwards' constitutional rights. Since the Court has concluded that Plaintiffs have failed to proffer evidence adequate to withstand summary judgment as to Edward's constitutional claims, Rhodora's claims cannot survive this motion. Therefore summary judgment is appropriate as to those claims.[3]

C. Plaintiffs' Remaining State Law Claims.

Plaintiffs have alleged several causes of action under the common law of New York. The Court may exercise subject matter jurisdiction over those claims due to the supplemental jurisdiction provided by 28 U.S.C. § 1367(a). Nonetheless, due to the Court's decision *supra,* the Court may decline to exercise such supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). After consideration of the arguments presented by the parties, the Court exercises its discretion to decline the exercise of supplemental jurisdiction over the remaining claims.

D. Plaintiffs' Cross–Motion to Amend the Complaint.

Plaintiffs have filed a cross-motion to amend the complaint. The amended claim would add one sentence with regard to the notice of claim filed in anticipation of Plaintiffs' state law claims. Rule 15(a) provides that leave to amend a pleading

---

**3.** The Court does not reach Defendants' arguments regarding the timeliness of Rhodora's notice of claim. *See* Defendants' Mem. at 27.

"shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, " '[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend.' " *Lucente v. International Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir.2002) (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) (per curiam)). "One appropriate basis for" evaluating the "productivity" of a proposed amendment lies in the relative futility of accepting the proposed amended complaint. *Id.* Since the Court has granted summary judgment as to the federal claims and has also declined to exercise supplemental jurisdiction over the remaining state law claims, any amendment as to those state law claims would be futile. Accordingly, because any such amendment would be futile, the Court denies leave to amend the complaint as to those state law claims.

## III. CONCLUSIONS

In light of the foregoing discussion, no genuine issue of material fact remains. Accordingly, Defendants' motion for summary judgment is GRANTED as to all federal claims. The Court declines to exercise supplemental jurisdiction over the remaining claims. Plaintiffs' cross-motion to amend the complaint to alter the state law claims is DENIED as futile. Consistent with the foregoing conclusions, the Clerk of Court is directed to CLOSE this case.

**SO ORDERED**